| 43 | 503 |
|----|-----|
| 29a | 562 |

</div>

## WILLIAM FERRELL v. THE STATE.

1. MURDER.—Express malice can only exist where there is a deliberate intention to take the life or to inflict some serious injury upon the deceased.

2. SAME—CHARGE OF COURT.—On a trial for murder it is error to instruct the jury that if they believe the accused, with a sedate mind and formal design, was attempting to kill A or B, and without malice towards the deceased, and without intention or design killed her, such malice is carried over to the person killed, and the jury should find the accused guilty of murder in the first degree.

3. Drunkenness neither aggravates nor excuses an act done by a party while under its influence; still it is a fact which may affect both physical ability and mental condition, and may be essential in determining the nature and character of the acts of the accused as well as the purpose and intent with which they are done.

4. KILLING ONE PERSON IN ATTEMPTING TO KILL ANOTHER.—Where the accused, under circumstances making the killing manslaughter, if effected, in attempting to kill one by accident killed another, against whom accused had no malice, such killing would not be more penal than that intended; and it was error to instruct the jury that "though the killing of the deceased was altogether unintentional, and defendant would have been guilty merely of manslaughter had he killed the party he was attempting to kill, yet he was nevertheless guilty of murder."

APPEAL from Hill.    Tried below before the Hon. F. P. Wood.

William Ferrell was indicted for the murder of Miss Martha Gray.    The facts, as detailed by the testimony, are that on the 26th of May, 1874, in Hill county, Ferrell and one Henry Parton went to a grocery, five miles distant from Mrs. Gray's, where Ferrell and wife lived, Mrs. Gray being his mother-in-law.    They returned late, drinking on their way five or six times, Ferrell once losing his saddle-bags, which were picked up by Parton; Ferrell talking much, and saying he would kill a man before next day; reaching Mrs. Gray's, Ferrell tried to ride into the house, but was prevented by his wife; he then called for "the d——d old woman—he intended to kill her;" he dismounted, went into Mrs. Gray's room, and employed himself some time beating her bed; coming out and going through a passage-way he found a hoe— broke the handle across a table, and taking a piece of the handle, about two and a half feet long, went to the door of another room, where Ike Gray and one Scroggins were sleeping, and called for Ike; Ike pacified Ferrell, who then commenced calling for Scroggins; Scroggins by this time had put on his clothes, and Ferrell, still calling for Scroggins, said, "Come out, God d——n you, I'm going to kill you before sun-up."    Scroggins tried to pacify him, but he still kept cursing and threatening; Scroggins attempting to go out by a low door, (only four feet high,) the only exit from the room, Ferrell struck at him (Scroggins) as he reached the door with the piece of hoe-handle and struck the top of the door.    Scroggins then sprang upon Ferrell, pushing him with one hand and stabbing him with the other, using a small pocket-knife.    They both fell together.    Scroggins kept stabbing him as fast as he could, Ferrell trying to catch his hands.    Ferrell's wife interposed, and tried to pull Scroggins off; Scroggins noticing her, sprang to his feet and ran as fast as he could.

Ferrell received eleven stabs, inflicted by Scroggins, none of greater depth than a quarter of an inch, except two, which were about half an inch deep, and none at all dangerous. Aided by his wife, Ferrell went into his room, but at once got a gun, returned to the door, and seeing the deceased, Miss Martha Gray, exclaimed, "I'll save one of you!" and fired, the shot taking effect, from which she died two days afterwards. The mother of deceased testified that her daughter, when conscious of death, said she knew Ferrell had shot her by mistake.

The charge of the court is sufficiently given in the opinion.

The jury found a verdict of guilty of murder in the first degree, with the death penalty.

Motion for new trial overruled, and defendant appealed.

*S. C. Upshaw*, for appellant.

*George Clark, Attorney General*, for the State.

MOORE, ASSOCIATE JUSTICE.—The judgment in this case must be reversed for error in the instructions given by the court to the jury, and also for refusing to give some of the charges asked by appellant.

We call special attention to only a few of the more prominent and essential of these errors to guard against their recurrence upon another trial of the cause.

The court instructed the jury, and, indeed repeats the proposition several times in different forms, if the defendant, Ferrell, with a sedate mind and formed design, was attempting to kill Scroggins or Mrs. Gray, and without malice towards the deceased, Martha Gray, and without intention or design, killed her, " such malice," that is, the malice towards Scroggins or Mrs. Gray, " is carried over to the person killed," and the jury should find him guilty of murder in the first degree.

This proposition is in direct conflict with the decision

of this court in the leading case of McCoy *v*. The State, 25 Tex., 33, and its uniform ruling from the adoption of the penal code, and the division of the offense of murder into two degrees. It was said by the court in the McCoy case, "If the formed design be not to kill the deceased or inflict on him some serious bodily injury, but to commit some other felony, the killing will not be on express malice. A attacking B, with malice, shoots at him, but misses him and kills C, against whom he owes no malice, it is murder." But as it is not with express malice to the party killed, and as the court had previously said the malevolence of murder in the first degree must be directed towards the deceased as its object, the court unquestionably are to be understood to hold that in the case put the offense is murder in the second degree. And it seems even to have been a matter of some doubt with the court whether, since the adoption of the code, (Art. 49,) the evil design against the party intended to have been killed can be said as at common law to be carried over and imputed to the deceased.

The counsel for appellant asked of the court the following instructions, viz: "While intoxication is no excuse for crime, yet the jury must in this case take into consideration the intoxication of the defendant in determining whether he was in a condition to entertain a malicious design." And also, "In considering the attack, (if you find that any was made by the defendant on Scroggins,) you will take into consideration the physical condition of the defendant, and whether from that consideration he was physically unable to use the hoe handle in a dangerous manner." Both of which the court refused, without pausing to determine whether these instructions were in all respects strictly accurate, or whether they should have been given in the precise form in which they were asked; for be this as it may, we think they were entirely sufficient to call the attention of the court to the

phase of the case suggested by them; and if they should not have been given in the precise form in which they were drawn, to which however we see no serious objection, such instructions as were appropriate and suitable to the aspect of the case suggested by them should have been given. This, however, was not done. The court not only refused to give the charges asked, but instead thereof instructed the jury "that drunkenness is no excuse or justification, or even palliation for crime, but must be considered rather as an *aggravation of the offense, and you will apply this principle of law to this case.*"

The erroneous instruction given by the court, to which we have heretofore referred, confounding to a great extent the distinction between the offenses of murder in the first and murder in the second degree, rendered it still more essential, in view of the facts before the jury, that they should have been correctly instructed upon the points suggested in these charges asked by appellant. But as we have said, the court, instead of doing this, told the jury that the condition of the defendant at the time of the homicide, the result of intoxication, was an aggravation of the offense, and should be so regarded by the jury—thus, in effect, telling them if the defendant was intoxicated he might properly be convicted of a higher grade of offense than the facts otherwise required; for it will be observed it is the offense and not its penalty which the court tell the jury is aggravated by appellant's intoxication.

It is needless for us to say that the law of this State gives no warrant for any such doctrine. While intoxication is certainly no excuse, much less justification for crime, it is a startling idea that the bare fact of one's being in this condition when the homicide is committed converts murder in the second into murder in the first degree, or will authorize if not require the jury to impose the penalty of death or confinement in the penitentiary for life instead of a term of years. This would be directly the reverse of the

rule laid down by the code, and would make the fact that the homicide was committed when the perpetrator was incapable of a deliberate intention and formed design to take life, or do other serious bodily injury for want of a sedate mind, an aggravation instead of a mitigation of the heinousness of the offense.

The correct rule upon the subject is that, although drunkenness neither aggravates nor excuses an act done by a party while under its influence, still it is a fact which may affect both physical ability and mental condition, and may be essential in determining the nature and character of the acts of the defendant as well as the purpose and in-tent with which they are done. Evidently, therefore, the fact of intoxication at the time the matter in question occurs may be a fact of little or no significance, or of the utmost importance, as it may connect itself with or be shown by the other facts to bear upon or enter into the case. As mere drunkenness does not relieve a party from responsibility for crime, when the nature and degree of it does not depend upon the state and condition of the mind at the time of its perpetration, the fact of intoxication is of little or no importance in cases of this kind.

But in the class of offenses in which criminality depends solely or to a certain degree upon the state and condition of the mind at the time the wrongful act is done, evidence of the state and condition of the mind, showing ability or inability of the mind to form or entertain a sedate and ordinate criminal design, is certainly of the most vital im-portance. (People *v.* Eastwood, 4 Kern., 392; Bish. Cr. Law, 300, *et seq.*)

If the testimony shows the killing is upon an antecedent grudge or pre-existing malice; that it is the result of a sedate, deliberate mind and formed design not engendered in an intellect clouded and confused by the fumes of liquor, or where the deceased, though slain by his assailant while the latter is under the influence of liquor, if it appear that

it was taken merely to nerve himself to carry into execution his preconceived purpose, the fact of intoxication is of no importance, unless it aids to show more fully and distinctly the pre-existing design in furtherance of which it has been used. But where there is no evidence of premeditation or any reason to suppose that the act done is not the result of a design formed, as far as the mind may be capable of forming a design while in a state of intoxication to such an extent as to be incapable of cool reflection, the fact of intoxication is then of the utmost importance; for if it is clearly shown that the purpose to take life had its inception and was carried into effect while the defendant is in a state of mental confusion, whether from drink or other cause, which renders him incapable of calm reflection or of forming a deliberate design to take life, the offense committed cannot be murder in the first degree. (Farver *v.* The State, 42 Tex., 265.)

It would be improper for us to discuss the facts or express an opinion as to the degree of appellant's offense, if any, had he killed Scroggins instead of Martha Gray, toward whom, as far as we can see from the record, he entertained no animosity whatever. But there can be no question, if Scroggins had been the victim of the fatal shot instead of the unoffending party upon whom it took effect, there are phases of the case upon which it would have been proper for the court to have instructed the jury on the law of manslaughter. From which it follows, as we think, that the court erred in refusing to give the charge asked by appellant, to the effect that, if appellant would have been guilty of manslaughter only had he killed Scroggins, if he shot the deceased, believing at the time that he was shooting Scroggins, he was only guilty of the offense of manslaughter. Instead of giving this charge, however, the court instructed the jury, though the killing of Martha Gray was altogether unintentional, and defendant would have been guilty merely of manslaughter had he have

killed Scroggins, he was nevertheless guilty of murder in thus unintentionally killing the deceased.

This instruction is evidently predicated in part at least upon article 49 of the penal code, which reads as follows: "If one intending to commit a felony, and in the act of preparing for or executing the same, shall, through mistake or accident, do any other act which, if voluntarily done, would be a felony, he shall receive the punishment affixed by law to the offense actually committed."

The offense actually committed was the killing of Martha Gray. But upon the supposition on which the proposed instruction was asked, this was unintentional and by mistake. What, then, is the offense actually committed when the fatal blow, had it taken effect upon the party against whom it was aimed, would have been manslaughter, by accident and mistake and without criminal carelessness falls upon another party in no way connected with the combatants? for it is the punishment affixed by law to this offense to which this article of the code has reference.

It would be a misconstruction of the code, and to lose sight of its spirit and purpose to say, because proof of a voluntary homicide unexplained by facts or circumstances of justification, excuse, or mitigation, authorizes the inference that such killing is with malice aforethought, and is therefore murder; that a homicide by accident or mistake in the perpetration of some other felony, but when there is no malice in fact, and from the defendant's condition of mind none can be implied by law, is to be punished as a voluntary homicide upon malice. To do so would not be to inflict the punishment fixed by law to the offense actually committed, but to impose that attached to a voluntary homicide, with malice, to an involuntary one as to which malice cannot be inferred in fact or implied by law.

The code says the party doing the act shall receive the punishment affixed by law to the offense actually committed, as if he had voluntarily committed the felony actually per-

petrated.   It was mainly, it is believed, the purpose of the framers of the code to mitigate by this article the harsher rule of the common law, under which, in many instances, a party may incur a severer penalty than would be inflicted for the act done by the malice of the act intended, being imputed or carried over to the offense actually committed; whereas by the construction given to it in the court below in this case, if correct, it increases instead of mitigating the stringency of the common law; for at common law, upon the facts on which the charge in question was asked, the killing would unquestionably be only manslaughter. (See 1 Bish., Cr. L., sec. 412, note 3, sec. 416; 2 Arch. Cr. Prac. and Pl., 6th ed., p. 217–4–5, and notes.)

The intent with which an act is done is the essence of the crime.   Here the felony intended, if committed, would have been manslaughter.   The act done is the unintentional homicide of a different person from the one intended, but without malice, and while the mind is under the influence of passion.   The act assigned and that done were both homicides.   That intended was voluntary and with intent to take life, which, if carried into effect, would have been manslaughter.   The homicide actually committed was involuntary and without intent to injure the party slain. And unless we can say that the absence of guilty intent is immaterial, and that it was the purpose of the code to measure the penalty by the result of the act without any regard whatever to the intent prompting it, we must, we think, conclude that the offense actually committed is not more penal than that intended.   But the degree of guilt must unquestionably be determined and measured by the intention coupled with the act resulting from the effort to give effect to this intention.   And where the intention and the act resulting from it are precisely the same, whether the fatal shot takes effect upon the party for whom it was aimed or on some one else, the guilt, it would seem, should be the same, except where there is intent to kill, or express

malice, for, as we have already said, it is only murder in the first degree, under the code, where there is express malice towards the party killed.

In what is here said we are to be understood as referring exclusively to cases, like the present, where the offense intended and that committed are precisely similar in their character. We have no reference to cases where the two acts are entirely distinct in legal character and incidents; as, for example, where, in an attempt by a robber to blow open a safe, he should unintentionally burn the house, or unwittingly commit a homicide.

There are other errors in the charge; but as we have had occasion during the present term to comment on instructions of a similar character, it is unnecessary for us to do so again.

The judgment is reversed, and the cause remanded.

<div align="right">REVERSED AND REMANDED.</div>