[No. 1446.]

## ELI McCONNELL v. THE STATE.

1. CONSTITUTIONAL LAW—BAIL.—The Bill of Rights, Section 13, provides
   that "excessive bail shall not be required." ·
2. BAIL.—Article 296 of the Code of Criminal Procedure provides that "the
   ·amount of bail to be required in any case is to be regulated by the court,
   judge, magistrate or officer taking the bail; they are to be governed in
   the exercise of this discretion by the Constitution of the State, and by the
   following rules:                ·
   "1. The bail shall be sufficiently high to give reasonable assurance that
   the undertaking will be complied with.
   " 2. The power to require bail is not to be used in such manner as to
   make it an instrument of oppression.              .
   " 3. The nature of the offense and the circumstances under which it was
   committed are to be considered.
   " 4. The pecuniary circumstances of the accused are to be regarded, and
   proof may be taken upon this point."
3. SAME—PRACTICE IN THIS COURT.—The assessment of the amount of bail
   is a matter within the discretion of the court, judge, magistrate or officer
   taking the same, ar d will not be revised by this court, unless it clearly
   appears that the discretion has been abused and the Constitution vio-
   lated.
4. MURDER IN THE SECOND DEGREE.—If one, committing an assault with
   intent to murder another, accidentally kill a third party, he is guilty of
   murder in the second degree.
5. NEGLIGENT HOMICIDE.—If, in an assault with intent to commit a battery
   upon another, and not to murder, one accidentally kill a third party, he
   is guilty of negligent homicide.
6. EVIDENCE.—See statement of this case for evidence held insufficient to
   warrant this court on appeal to hold the sum of ten thousand dollars to
   be excessive bail.
7. SAME—PRACTICE.—When the record in a *habeas corpus* trial fails to dis-
   close the pecuniary circumstances of an applicant for bail, this court can
   not consider that question.

HABEAS CORPUS on appeal from a judgment of the Hon. A. J.
Hood, Judge of the Twenty-ninth Judicial District.

McConnell, the applicant for bail, was held under a *capias* of
the district court, charging him with the crime of murder, his
victim being his own child, eighteen months old.   He was
awarded bail in the sum of ten thousand dollars, an amount

which he avers is excessive. He prosecutes this appeal in an effort to secure a reduction.

Summarized, the evidence on behalf of the applicant is about as follows:

The return of the sheriff showed that applicant was held on a *capias,* issued out of the district court of Parker county, on a charge of murder by indictment.

Mrs. E. A. McConnell testified, for the applicant, that she was his wife. She and he had domestic trouble, and, on the fifteenth day of November, 1882, started together in a buggy to go from their house, in Weatherford, to the house of H. B. McConnell, in the country, to adjust it. H. B. McConnell is the father of the applicant. The witness had her eighteen-months-old child, Bidie, with her. The applicant was drinking some, and had a half-pint flask of whisky with him, which he drank on the way.

Detailing the tragedy, the witness testified as follows: "Our child was killed on the way. I do not know how it was killed. The child was well when we started from home. She died in my arms on the road, twelve miles from town, just after we left Mr. Staggs's. We got lost, wandered around, and came back to within four miles of Weatherford. I was hardly conscious of what was going on. The child was dead when we got back to within four miles of Weatherford. It was dark when we wound around and came back. As we went out, we stopped at Mr. Staggs's, and I asked for protection. As we went back the second time, we stopped at Mr. Odell's to inquire the way. I got out of the buggy and went in at Mr. Staggs's. Mrs. Staggs gave me milk for the child, but it would not drink it. Mr. McConnell came in and compelled me to get into the buggy. My husband and I had trouble—quarreled on the way. He asked me a question which I refused to answer, and he began to abuse me.

"There was a pistol shot fired in my face by my husband, to frighten me. I do not know where the ball hit. There was a hole in the top of the buggy. I was sitting on his left side, the child's head on my left arm, and its feet towards him. The child's position was about natural, its face angling towards Mr. McConnell. Mr. McConnell pulled the pistol out of his pocket and fired it off. I do not know where the ball struck. I do not remember that he fired any other shot in the buggy. He did not get out of the buggy when the shot fired. It was about a half mile from Mr. Staggs's. When I ran off and left him, he fired other shots. I dropped my hat, and he got out to get it, and I

drove on—ran off—and he fired other shots, but I don't know how many. I do not know of any shots being fired after we passed Staggs's. It was our youngest child. Mr. McConnell thought a great deal of it, and was always fond of his children.

"I don't know how the child was killed. When I drove off, after the hat fell off, he fired several shots; I don't know how many. I looked back and saw him shooting towards me. The top of the buggy was up, and the back curtain was down. I looked through the glass. I was trying to get away from him. When he came up, I do not know how many other loads there were in the pistol. When it was discovered that the child was hurt, I said to him: 'You have killed the baby.' He said: 'Oh, no! You say it was an accident.' 'I said: 'Yes, I think it was an accident.' He said: 'It is only stunned.' The baby gave a pitiful little whine, and I thought it was recovering, and tried to get it to nurse, but it would not take the breast.

"The way the conversation came up, he was abusing and beating me with the pistol. I must have been unconscious; and I laid the child back, and saw that its eyes were nearly closed—set in her head—and said: 'You have killed my child.' He said: 'No, it is only stunned; let it nurse.' It would not nurse. He was drinking when he left town, and drank, I think, a half-pint flask of whisky on the way. I don't think he was responsible for what he was doing.

"We got to father-in-law's, H. B. McConnell's, about eight o'clock. He (applicant) sobered up after we got there. He commenced abusing me after the baby was dead. I told him not to abuse me while the baby was dead, and he desisted. When we got to his father's I said to his father: 'Here is little Bidie; she is dead. Eli killed her accidentally while beating me.' His father took the child into the house, and I went in with him. The balance of the family staid out with Eli. He thought the child was dead. He felt her feet, knees and hands, and asked me if her face was cold. I knew she was dead, and think that he knew it before we got there. I pulled the hood off to look at her head, and saw, and said: 'There is her brains.' His father pulled the hood back over her head. I did not see the child any more until she was dressed. The family buried her next morning. I did not go to the burial. The neighbors knew nothing about it. The child was killed Wednesday night, and we came back to Weatherford Thursday evening. I remained in Weatherford until I telegraphed to Mr. West, and

went to Dallas with him.   I came back to Weatherford with my sister."

On her cross-examination, the witness said that by abuse she meant that the appellant beat her over the head with a pistol. He beat her once after the conversation about the child being dead.   He used abusive language all the rest of the way.   The witness and the applicant went to H. B. McConnell's because the applicant said that he had written to his father, H. B. McConnell, giving him two of the children, and had sent the little boy off, and that he was going to leave.   Applicant said that he had been informed by his brother-in-law that his father had said that the two youngest children of the witness were not the children of the applicant.   Mrs. Pigg was at the McConnell house in Weatherford when witness and her husband left.   Applicant had a bottle of whisky and a pistol when they left.   Colonel Hindman and Mrs. Pigg asked him for the pistol.   He refused to give it up, and said : "It shall not hurt me or mine," and touched himself.   The applicant commenced beating the witness after they had traveled about two miles on their journey.   He asked the witness if the children were his, and the witness replied in the affirmative.   He said, "I believe little Bidie is mine, do you say Bidie is mine?"   Witness answered, "Yes."   He then said: "Do you say that Lillie is mine?"   The witness replied, "Yes," and the applicant beat her and said, "You have got to acknowledge that she is not mine!"   He would talk to the witness a while, and beat her a while.   He was beating her just before he got out to get her hat, which was why the witness drove off.   He held the pistol in his right hand and the lines in his left.   He afterwards said to the witness, "I don't see how I kept from killing you," and told her that the pistol was a five shooter which he got from James Crowdus.   The witness did not examine the pistol.

On re-direct examination by the applicant, the witness said that he accused her of being too intimate with Bud Elliott, who lived on Clear Fork.   She had never confessed such intimacy to the applicant.   She made no such confession on November 9, 1882, in the presence of Colonel Hindman.

Referring to a letter shown her, she said that the handwriting resembled her own.   She gave the letter to her little boy and directed him to put it into the post office.   He had asked her to write to Santa Claus, and she told him this letter was written to Santa Claus.   The witness declined to answer whether or not

she directed the letter in person to Mr. Elliott. She did not know that the letter shown her was the letter she wrote. She thought Mr. McConnell and Colonel Hindman dictated that letter. Asked by counsel if the letter was written to Mr. Elliott, the witness asked, "Is Mr. Elliott's name in the letter?" After examining the letter the witness said: "They copied the letter so nearly alike that I cannot say whether or not this is the letter I wrote to Elliott. The letter I wrote was written before the one dictated by Hindman and McConnell. I had not written any letters previous to the one in question. I do not say that this is the letter I wrote."

The witness denied that there was a plot for "us" to go down and kill Elliott. There was, however, a plot to have Elliott come to the McConnell house, in order to enable McConnell to kill him. A gun was loaded, a window raised, and all preparations made for that purpose, and the witness was compelled by McConnell to write a letter to Elliott to entice him to the house for that purpose. The witness wrote two or three letters to Elliott for the purpose in hand, none of which suited McConnell; whereupon he had Hindman write one which the witness supposed was satisfactory.

In reference to this part of her narrative, the witness testified as follows: "The letters written in pursuance of the plot to kill Elliott were written after the one I sent by my little boy and was brought back by my husband. The capital 'L' in the letter here shown me stands for 'Lillie.' The letter 'B' stands for 'Bud,' and 'E' for 'Eli.' When we went down to father-in-laws's I did not confess guilt. Mr. McConnell tried his best to make me confess, and he also tried after we came home. In writing the letter my son John asked me to write to Elliott to bring him some Christmas presents. If there is anything else in the letter in question it was put therein by reason of McConnell and Hindman forcing me to put it in. The letter was copied by them and additions made to it. H. B. McConnell's family did not like me. They had tried to get me to sign a deed to property. I wrote a letter to Bud Elliott, at the request of John, and in it was nothing except in reference to the Christmas presents for the children. The reason I objected to signing the deed was that my money paid for the land, and I did not want to let him have the land. I asked father-in-law if he said that little Lillie was not Eli's child, and he replied that he had never said any such thing. H. B. McConnell's family and I had no differences prior

to my refusing to sign the deed for them.  Since then they have not liked me."

The letter exhibited reads as follows:

"Nov. 9th, 1882.

"My dear B.:

"I would have written long ago, but thought I would have seen you before you this.  I was going to the show, and John was dreadfully disappointed and said 'I wish B. was in town. I know he would take me.'  Then E. said he was; and I went expecting to see you, and looked until my eyes ached and could not see you.  John and me were both dreadfully disappointed. This is the last letter I am going to write until I see you.  Just to think, it has been 9 long months since I saw you!  You certainly don't love me as you used to, or you would have come to see me.  I could meet you somewhere if I knew where you were in town.  I have one of L. pictures for you.  Will give it to you when I see you.  It is right good, but not as pretty as she is.  I am nearly dead to hear from you.  I have the blues so bad sometimes I can't keep from crying.  L. thinks I am writing to Santa Claus.  I have seen the toys in town and told her of them, and she begs me every day to write for her, so I thought I would let you be her Santa Claus.  I want to get her a doll and a little doll buggy.  The doll will cost $1.50 and the buggy $1.75. I want you to get them for her.  Let me know when you are in town, and I will meet you somewhere.  I can go to Tom Stogdon's.  He lives close to a wagon yard.  I would like for you to come in town next week if you can.  I have so much to tell you that I can't write, I is nearly dead to see."

William Staggs was next introduced by the applicant, and testified that he knew the applicant but did not know Mrs. McConnell.  On or about the fifteenth day of November, 1882, the witness, who was then in his field on his place about eight miles from Weatherford, saw McConnell and a lady in a buggy. Witness went to the house from his field and found the buggy, containing McConnell and the lady, standing in front of the house.  This was, to the best of the recollection of the witness, a little after sundown.  Before he got to the house the witness heard, to the best of his recollection, three shots fired at a distance of a half a mile from the house, and in the direction of the buggy.  The witness heard no shots after the buggy left his

house going east, or in the direction opposite from town. The buggy top was entirely up.

McConnell, while at the house, called the witness to the gate, and talked to him briefly. He told the witness that he was undergoing domestic trouble, that it was of a character to greatly excite any man, and had been going on for several years, but that he had just detected it. He told the witness that his wife dropped or threw her hat out of the buggy and he got out to recover it, when she plied the whip and ran off; that he fired at the horses with the view of disabling one of them, and so overtake the buggy. He did not say how many shots he fired. If compelled to answer whether the applicant was sober or drunk, the witness would pronounce him sober but somewhat excited.

Cross-examined, the witness stated that, from his position in the field, he heard some one in the buggy scream, and took the voice to be that of a woman or a child. He then saw a man get out of the buggy and walk back, and then saw the horses start on, whipped by some one in the buggy. The man then turned and ran after the buggy a short piece, and slowed up into a walk. The witness did not see the man at the time he heard the shooting. A little son of the witness brought to him a lady's hat, pocket handkerchief, and some false hair, picked up about the place where the screaming was done.

Re-examined, the witness stated that the road curved to the right somewhat where the buggy ran off from the man. The horses left the man in a gallop. Witness did not know how far distant from the man the buggy was when the shots were fired. He heard the shots fire about twenty minutes after the buggy left his house. He afterwards saw the buggy going west towards Weatherford, along the same road it had previously traveled.

H. B. McConnell, father of the applicant, was next introduced. He testified that the applicant and his wife reached his house on the evening of November 15, 1882, at about eight o'clock. The youngest child was handed to the witness. Its limbs were then cold, but its body was still warm. Mrs. E. A. McConnell, the wife of the applicant, told the witness that her husband had been beating her, and while doing so accidentally struck the child with the pistol and killed it. She also confessed to him that she had been too intimate with Bud Elliott, and said that it was for that her husband beat her. The witness made an examination of the child, and did not think that it had been shot.

The child was dressed and it remained at witness's house until the next day, when it was buried. The witness was acquainted with the applicant's children, and did not think his three year old daughter Lillie resembled the rest, and it did not look like the McConnell family. The applicant's wife has brought suit for divorce, and has tied up all of the applicant's property, who has nothing; but the witness thought the applicant could give bail unless the amount exacted should be excessive.

Cross-examined, the witness stated that he told the wife of the applicant, about two years before their trouble, not to come about his, the witness's, house. About that time, the applicant sold the witness a tract of land, to which the wife, Mrs. E. A. McConnell, refused to sign the deed. The witness had never seen anything wrong about the deportment of Mrs. E. A. McConnell. Since the land trouble, until her arrival at his house as stated, the witness had spoken to Mrs. E. A. McConnell but once.

Alex. Hindman testified that he was present, at their house, when the applicant, his wife and deceased child started to the house of H. B. McConnell, on November 15, 1882. The applicant was then a more qualified subject for a lunatic asylum than he was a man to be entrusted with the care of a wife, child and buggy. He was both crazy and under the influence of liquor. The witness had observed his conduct for several days previous, and knew that he was in great distress of mind, growing out of domestic affairs. The witness was called in as a friend and neighbor, a few days before, to assist in adjusting family affairs. The defendant had a letter purporting to have been written by his wife to one Elliott, which he claimed to have intercepted. This [which is the letter copied in this statement of facts] the wife acknowledged to the witness to have written. She acknowledged, also, in the presence of her husband, that she had several times had sexual intercourse with Elliott. All of this occurred on or about November 9, 1882, and the acknowledgments were voluntary on the part of Mrs. McConnell. Afterward the applicant fixed up a letter to Elliott, in order to lay a plot for him, but the witness told them that it would not do, and it was abandoned. Mrs. McConnell was not forced to write any letter that the witness knew of.

On cross-examination, the witness stated that he several times consulted with the applicant in regard to this domestic trouble. When asked by counsel whether the letter read to him was not the one which he dictated and made Mrs. McConnell copy, the

witness replied that if counsel would produce any letter written by him he would acknowledge it, but refused to answer the question. In answer to the question whether or not he stated to Mrs. Pigg that there was nothing in the letter of an "improper character," the witness stated that he made no such statement to Mrs. Pigg, but did tell her that the letter contained "nothing criminal." He may have stated that Mrs. McConnell was a lady so far as he knew, but if he did it was upon the principle commended by Christ, when upon earth He said: "Let him that is guiltless cast the first stone." Mrs. Pigg asked of the witness answers to some of the most improper questions a lady could ask a gentleman.

Mrs. William Staggs testified, for the State, that the applicant, his wife and child came to her house on the evening of November 15, 1882. Mrs. McConnell and the child came to the house in a buggy, and the former said that her husband had been beating her and she asked protection. Presently the applicant came up and ordered his wife to get into the buggy. She refused at first and asked the witness to appeal to her husband to desist in his abuse of her. The applicant replied that he believed the child was his, and that if she would give the child to him he would go. He told the witness that his wife was not worthy to associate with decent people, and advised the witness to kick her out of the house.

Mrs. Dora McClosky testified that she was a sister of Mrs. McConnell, and lived in Dallas. Soon after the death of the deceased child, the applicant wrote to her, stating that their baby had been killed and his wife much injured by the wrecking of a buggy and requesting the witness to go to Weatherford. She went to Weatherford at once. She learned of the trouble between her sister and the applicant on her arrival. The applicant told the witness that he accidentally struck and killed the child while beating his wife. The witness then asked him, "What if you had killed your wife?" and he replied: "That is what I intended to do." The witness went to Alex. Hindman and told him that she came to find out the truth of the report concerning Mrs. McConnell's character. Hindman replied that he knew nothing against her character, and that he believed her to be a perfect lady.

Virginia Pigg, for the State, testified that she was at their house when the applicant, his wife and child started to H. B. McConnell's, in the country. The applicant carried a pistol and a

flask of whisky with him. The witness asked the applicant for the pistol, but he refused her, and said: "It will not hurt me or mine" (striking his breast). Mrs. McConnell refused to get into the buggy until peremptorily ordered by her husband. The witness was at the applicant's house shortly after his return from his father's. The witness remarked to him: "I see you have got back." He replied, "Yes, but we did not bring back our little baby; in crossing Bear creek the horses turned the buggy over, killing the child, and seriously hurting my wife." Mrs. McConnell was then in an adjoining room, and the witness had not yet seen her. Later on the same day the witness saw Mrs. McConnell. She had been seriously hurt—was bruised and cut about the face and arms and one eye was badly swollen.

The witness stated that she had a conversation with the witness Alex. Hindman at Mr. Applegate's residence, the evening after the child was killed. She asked Hindman to tell her whether or not there was any truth in the rumors reflecting upon Mrs. McConnell's character. Hindman replied that so far as he knew, Mrs. E. A. McConnell was a perfect lady, and that there was nothing in the alleged intercepted letter of an improper character.

*Ball & Stewart* and *J. W. Stephens*, for the appellant. The nature of this case, as shown by the record, is as follows: The appellant, having discovered the infidelity of his wife, became so disturbed and excited that he lost control of himself, and in his madness and rage began to abuse her and beat her with a pocket pistol, and, while so beating her, accidentally struck and killed his own child, about eighteen months old.

Appellant submits the following propositions:

First proposition: The child was accidentally killed while appellant was committing a misdemeanor on his wife, to-wit, aggravated assault and battery, and negligent homicide is the offense. (See Penal Code, Arts. 588, 589, 590, 591.)

Second proposition: If appellant was attempting to kill his wife, the accidental killing of his child could only be manslaughter. (2 Wharton's Crim. Law, seventh ed., sec. 966.)

Third proposition: If appellant assaulted his wife with intent to murder her, and accidentally killed his child, the offense could only be murder in the second degree. (*Terrell* v. *The State,* 43 Texas, 503.)

Fourth proposition: The record fails to show that the weapon

with which appellant assaulted his wife was a deadly weapon in the manner used when the child was killed.

Fifth proposition: The record shows that appellant's property is all tied up in litigation; that he has nothing, and is not able to give excessive bail, if any at all.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, J.   This is an appeal from a judgment rendered by the Hon. A. J. Hood, judge of the twenty-ninth judicial district, upon a trial on *habeas corpus*, which judgment admitted the applicant to bail in the sum of ten thousand dollars.   Appellant contends that the amount of bail required is excessive, and this is the only question presented for the consideration of this court.

It is a constitutional provision that "excessive bail shall not be required." (Bill of Rights, Sec. 13; Code Crim. Proc., Art. 8.) Rules for determining the amount of bail are prescribed by Article 296 of the Code of Criminal Procedure, as follows:

"The amount of bail to be required in any case is to be regulated by the court, judge, magistrate, or officer taking the bail; they are to be governed in the exercise of this discretion by the Constitution of the State, and by the following rules:

"1.   The bail shall be sufficiently high to give reasonable assurance that the undertaking will be complied with.

"2.   The power to require bail is not to be used in such manner as to make it an instrument of oppression.

"3.   The nature of the offense and the circumstances under which it was committed are to be considered.

"4.   The pecuniary circumstances of the accused are to be regarded, and proof may be taken upon this point."

It will be perceived that fixing the amount of bail is a matter within the discretion of the court, judge, magistrate or officer taking the same, and being a matter of discretion this court will not revise the action of the lower tribunal, unless it be made clear that the discretion has been abused, and the Constitution violated.

In the case before us, we cannot say from the evidence presented in the record that the amount of bail required is excessive.   Appellant is charged by indictment with murder.   It is not proper that we should discuss the evidence in the case, farther than to say that the position assumed by his counsel that the offense, if any, of which he could be convicted by

the evidence is negligent homicide, is not, in our opinion, correct. If appellant, while assaulting his wife with the intent to murder her, accidentally killed the child, this would not be negligent homicide, but would be murder in the second degree. (Penal Code, Art. 47; Art. 590; *McCoy* v. *The State*, 25 Texas, 33; *Bean* v. *Matthieu*, 33 Texas, 591; *Angell* v. *The State*, 36 Texas, 542; *Ferrell* v. *The State*, 43 Texas, 503; *Taylor* v. *The State*, 3 Texas Ct. App., 387; *Halbert* v. *The State*, 3 Texas Ct. App., 656.)

If the intention of appellant in assaulting his wife was not to kill her, but was only to beat her, and in perpetrating this offense he accidentally killed the child, then and in that case only would the offense come within the definition of negligent homicide. (Penal Code, Arts. 587, *et seq.*; *Ferrell* v. *The State*, 43 Texas, 503.)

It not appearing to us, therefore, that the appellant's offense is clearly not murder, we cannot say, in considering the nature of the offense and the circumstances under which it was committed, that the judge abused the discretion confided to him by the law, in fixing the amount of bail.

We are asked to consider the pecuniary circumstances of the appellant in determining this question. It would be very proper for us to do so, if it were shown by the record what are his pecuniary circumstances; but this the record fails to show. We are informed by the evidence that he has some property, which is involved in litigation, but we are not informed as to the character and value of this property, or the nature of the litigation in which it is involved. It may be property worth one hundred thousand dollars or more, and his title to it, notwithstanding it may be in litigation, may be valid, and worth thrice the amount of the bail required. We cannot determine from this character of evidence the pecuniary circumstances of the appellant, and certainly will not revise the action of the court below, who was in a much better position than we are to judge of appellant's ability to give the bail, upon evidence so meagre and uncertain. It is presumable that appellant could have shown by proof his pecuniary circumstances, and he having failed to do this, it cannot reasonably be expected that this court will revise the action of the court below in fixing the amount of bail. The judgment is affirmed.

*Affirmed.*

Opinion delivered February 3, 1883.