Opinion delivered March 20, 1886.

[No. 2062.]

R. P. MUSICK *v.* THE STATE.

1. MURDER—CHARGE OF THE COURT.—Under the Code of the State, the express malice, which is the distinctive ingredient of murder in the first degree, must be directed towards the particular individual killed. If another than the one against whom the express malice is conceived and entertained be the victim, the homicide becomes murder of the second degree.    The charge of the trial court upon this subject, harmonizing with the doctrine thus announced, was correct.
2. SAME—FACT CASE.—See the statement of the case for evidence *held* sufficient to support a conviction for murder in the second degree.

APPEAL from the District Court of Cherokee.    Tried below before the Hon. J. I. Perkins.

Under an indictment which charged him with the murder of Philip B. Owens, in Cherokee county, Texas, on the twenty-third day of November, 1885, the appellant was convicted of murder in the second degree, and his punishment was assessed at a term of forty years in the State penitentiary.

J. G. McElroy was the first witness for the State.    He testified that he was in the town of Jacksonville, Cherokee county, Texas, on Monday, November 23, 1885.    A certain law suit styled B. F. Musick v. The Missouri Pacific Railway Company, was tried in the justice's court on that day.    The plaintiff in that case was a brother of the defendant, and he was suing the

railroad for the value of a horse alleged to have been killed by the company's cars. The witness was not present to testify in that case, but was actively engaged in securing the evidence for the railroad company. The deceased was present and was a witness for the railroad company. Lon Lowery was in attendance upon the court as a witness for the plaintiff. This appellant was present, and took an active interest in the case, but did not testify as a witness. Lowery, testifying for the plaintiff, estimated the value of the horse killed at one hundred or one hundred and twenty-five dollars. Deceased, when placed upon the stand by the defense, testified that the value of the horse was between thirty and forty dollars. While deceased was testifying, witness saw the defendant and Lowery several times exchange nods and winks, and at several different times during the day of the trial, he saw the defendant, Lowery, the Northcuts, Rosses, and others of this defendant's friends, in close private conversation.

The witness, at the time of the trial of the case referred to, lived about five miles from Jacksonville, and about a quarter of a mile from the house of the deceased. The witness went to Jacksonville on that day in a two mule wagon. He loaded his wagon with lumber, and started home from town about sunset. Deceased accompanied the witness in the wagon. Witness did not know when the defendant and Lon Lowery left town on that day. When witness and deceased reached a point about three and a half miles from Jacksonville, on their way home, the witness stopped his wagon and got out to repair a hame string that had broken. While he was standing in front of his mules, tieing the hame string, the deceased, who was sitting on the lumber, in the wagon, speaking in a low tone of voice, told the witness that there were some parties around the wagon. Witness looking about him, asked deceased where the parties were. Deceased pointing down the road over which he and witness had just passed, replied : "There they are now, crossing the road." Deceased then told witness to run, else the parties would kill kim. Witness replied that he was afraid to run. Deceased then said: "Well, then, get up close to me, and I will drive. I don't think they will hurt me." Witness got up on the lumber in the wagon and took his seat near the deceased. Deceased first advised witness to get on the coupling pole underneath the wagon, which witness tried to do, but found the space between the coupling pole and the lumber too small to admit his

body. He then got on the wagon with the deceased. When the wagon had crossed the bridge over a branch, about a quarter of a mile from the point where the hame string was repaired, and just as it started up a hill, the witness slipped from the wagon on the east side,—the wagon traveling north,—and walked along the road, stooping over and resting his left hand on the lumber in the wagon. He had traveled thus but a few yards, when two guns were fired from the west side of the road. Deceased fell from the wagon crying : "Oh, Lordy !" Witness saw the flash of the gun at the second shot. When shot, the deceased was sitting on the wagon, his feet hanging over the side, and facing west. This shooting occurred shortly after dark. Witness and deceased were overtaken by dark about three miles from Jacksonville. From the time of the first alarm to the shooting, the witness and deceased had crossed a bridge over the small creek, and had started up the hill. The shooting occurred just as the wagon started up the incline. The two shots described were fired from the west side of the road. Deceased was shot in the breast with buck shot. The range of the buck shot through the body was oblique from the left breast. The body of the deceased was afterwards found in the woods some seventy-five or eighty yards from the wagon, which had moved some fifteen or twenty steps from the point of the shooting.

Immediately after the fall of the deceased, the witness started in flight up the road, but, being cut off by two or more men, one of whom he distinctly recognized to be Lon Lowery, he turned and ran back towards his wagon, firing his pistol in the air and exclaiming : "I have got you now !" Seeing that he was about to be cut off again, the witness turned and fled south. When he reached a point near where the wagon was then standing, a man sprang from ambush in front of him, and fired a pistol almost point blank in his face. By the flash of the pistol, by starlight, and by the light of the moon, just then rising over the tree tops, the witness positively and unerringly recognized the defendant as the man who fired that shot. He had known the defendant intimately, and could not have been mistaken as to his identity. Witness ran on to A. P. Padgitt's house and reported the killing, and with Padgitt went to Jacksonville, where he found sheriff Reagan and reported to him. Reagan organized a *posse,* and, with witness, went to the place of the assassination. The body of the deceased was found about eighty yards distant from the

wagon, and on the west side of the road. Seven or eight buck shot had entered the left side of the body, and undoubtedly produced the death of the deceased. The mules, still hitched to the wagon, had pulled it to a point about twenty steps distant from the point of the killing, where it was stopped by a rut in the road. Several shot holes were found in the lumber.

The witness went with the sheriff and posse to several houses on that night, in search of the murderers. They went to the defendant's house, but did not find him at home. When they reached Lon Lowery's house they found defendant and Lowery together in bed. Defendant's horse was found hitched to the rear of Lowery's crib. In the crib, and just above the point where the horse was hitched, a double barrelled shot gun, both barrels recently discharged, was found secreted in the fodder. Defendant and Lon Lowery were arrested. On the next morning the witness saw the tracks of two persons behind a tree and stump to the left of the road at the point from which the fatal shots were fired. The tracks indicated that the parties had stood behind the tree and stump for some time. One of the tracks was a large, and the other a smaller one, and they corresponded with the tracks of the defendant and Lon Lowery. The assassination occurred in Cherokee county, on the Jacksonville and Troupe road, about four miles from Jacksonville. The defendant did not live on that road, but on another road which led north from Jacksonville, and was known as the upper Jacksonville and Troupe road. The place of killing was three and a half miles southwest from Lon Lowery's house, two miles from the defendant's house, a half mile from Beckwith's, two miles from Tom Musick's, two and a half miles from William Lowery's, three and a half miles from Ben Northcut's. Of three neighborhood roads in the vicinity of the place of the killing, two intersected near that point, and one of them led immediately to Lon Lowery's house. None of the roads were examined for tracks. Witness was a detective, in the employ of the Missouri Pacific railway, and was the principal witness in prosecutions pending against the defendant and his brother-in-law, Ike Northcut, for placing a blind mule and other live stock obstructions upon the railroad track, to the great peril of the traveling public, and for the purpose of obtaining fictitious damages against the company for killing stock. Two cases for thus obstructing the railroad were then pending against the defendant, and two were pending against him for swindling the company. One case of each kind

was also pending against Ike Northcut. The indictments in those cases were presented at the preceding term of the court, and each bore the name of witness as a witness for the State. The witness had also been subpœnaed as a witness in each of the cases. Referring to the blind mule obstruction mentioned, the witness said that the defendant and Ike Northcut asked him to aid them in placing the blind mule on the track. Witness agreed to do so, and notified the company's agents of the proposed enterprise. The mule was placed upon the track at the place and time agreed upon, to be run over by a passenger train, and witness, defendant, and Ike Northcut, retired to a reasonably distant point to await developments. After the train passed, witness, defendant and Ike Northcut started to the point where they left the mule. When they got within about fifty yards of that point, somebody near it struck a match, and witness, defendant, and Northcut, ran off into the woods. The match was struck by parties who, acting upon witness's information and advice, were watching. The witness had been apprehensive for some time that defendant and Northcut would kill him, and had been warned of defendant's threat to kill him.

The homicide occurred between seven and eight o'clock at night. It was dark in the bottom when the fatal shot was fired, but the moon had risen high enough to shine over the tops of the trees. The deceased was a larger man than the witness. He was dark complexioned and wore no whiskers on his face except a mustache. He had on a broad brimmed slouch hat. The witness was light complexioned, with sandy hair and goatee. He wore a new narrow brimmed hat on the night of the killing. When killed, the deceased was sitting on a load of white lumber, the wagon being in the middle of the road. From all the surrounding facts the witness believed that parties standing at the tree and stump, where the tracks were found, could easily distinguish the deceased and the witness. The witness was certain that he could, under like circumstances, distinguish between two of his acquaintances with as marked physical differences as there were between himself and deceased. The defendant was well acquainted with the witness and the deceased, and saw them on that day in Jacksonville, dressed just as they were when the fatal shots were fired. The witness recognized the gun he found at Lowery's as the defendant's gun.

Messrs. Hurber, Rainey, Allen, Newton and others testified, for the State, that paper wadding, recently discharged from a

shot gun, was found upon the ground near the place of the shooting. That wadding was made from paper sacks bearing the printed card of Douglass & Bro., Jacksonville.

Henry Haden testified, for the State, that he was a clerk in the mercantile establishment of Douglass & Bro., Jacksonville. He identified the particles of paper wadding to be fragments of such paper sacks as were used by Douglass & Bro. for putting up articles sold. Lon Lowery was in Douglass & Bro.'s store on Monday, the day of and before the killing. He purchased a quarter of a pound of powder, a pound of squirrel shot, and a box of water proof caps, which articles the witness put up in paper sacks similar to that of which the waddings were fragments.

Sheriff John B. Reagan, testifying for the State, corroborated the witness McElroy as to the finding of the body of the deceased, the character and location of the wounds on the body, the arrest of several parties, including the defendant, and the discovery of the defendant's gun in the fodder in Lowery's crib. Defendant was found at Lowery's house in bed with Lowery. When his gun was discovered, the defendant became very much excited, made no explanation of how his gun came to be secreted in the fodder, and denied knowing anything about the killing. The crib in which the gun was found, and to which defendant's horse was tied, was about thirty steps from Lowery's house. Defendant and Lowery were the only adult males on Lowery's place when they were arrested.

H. Tyre testified, for the State, that he lived about a half a mile from the place of assassination. He heard as many as five shots early on the night of the killing. The first two sounded like shot gun reports, and the others like pistol shots. About ten days before the killing, the witness heard the defendant, speaking of the witness McElroy, say: "Me and Jack has always been like brothers, but now it seems like Jack is trying to get the advantage of me. It looks hard."

Cross-examined, the witness said that defendant spoke of McElroy "jumping around," and remarked: "Jack needn't be afraid of me; I wouldn't hurt a hair of his head." The shot gun in evidence was identified by the witness as the gun he bought from Captain Langston, and subsequently sold to the defendant.

Mr. Beckwith testified, for the State, that he lived about a half a mile from the place of the assassination. He heard five shots fired early on the night of the killing. The first two shots

---

---

were evidently fired from a shot gun, and the last three from pistols. The shots described were fired at about seven o'clock. The first two were fired very near together. The three others were fired at intervals.

M. V. Shaw testified, for the State, that he was in attendance upon the justice's court in Jacksonville, on Monday, November 23, 1885, when the case of Musick v. The Missouri Pacific Railroad was tried. The defendant, Lon Lowery, and others of their crowd retired to some distance from the general crowd, and held a long private conversation.

Captain Langston testified, for the State, that on one occasion, shortly before the killing, he met the defendant at Ben Musick's gin. On that occasion he heard the defendant say something about some indictments which had been presented against him. Defendant accused the witness of being instrumental in their origin. Witness denied that he had anything to do with the finding of the indictments. Defendant replied that he had heard a great deal of talk, but did not blame the witness about the indictments, but that he did blame Jack McElroy. He then said: "If there is any money in this thing, I will find it out, and if Jack McElroy did have anything to do with it——." He stopped short, and said nothing more. The shot gun in evidence is the gun which the witness sold to H. Tyre, and which Tyre subsequently sold to the defendant.

John Bullock testified, for the State, that a few days before the killing he met and had a conversation with Lon Lowery, at a mill near Jacksonville. Several parties were present. In that conversation Lowery detailed the particulars of a quarrel which occurred a few days before, between his brother and Jack McElroy. He said: "I can whip Jack McElroy and all of his brothers, and I will see Jack McElroy some other day." Witness saw the defendant and Lon Lowery together in Jacksonville on the day of the killing. About five o'clock on that evening he saw defendant leading Lowery's horse towards Lovelady's store.

Cube Ferguson testified, for the State, that on the Monday of the murder, at about a half an hour by the sun, he saw the defendant and Lowery going out of Jacksonville on the Larissa road, on which road the defendant and the witness Spears lived. They were about four hundred yards from the north edge of the town when the witness saw them, traveling in a fast trot, and apparently in haste.

Cicero Spears was the next witness for the State. He testified

that he had resided in Cherokee county about forty years, and was thoroughly acquainted with all of the road ways and localities in the county. His residence was situated on the Larissa road, about one mile north of Jacksonville. Just before sundown on the fatal Monday evening, the witness saw the defendant and Lon Lowery pass his house, traveling in a fast trot and a lope. Defendant lived two and a half or three miles distant from the witness, on or near the same road. It was about four and a half miles from Jacksonville to the defendant's house, and the place of killing was on another road, and about four miles east from the witness's home.

Allen Newton testified, for the State, that the wadding in evidence was found on the ground of the killing, on the south side of the road, about ten feet from the wagon.

Justice of the peace S. A. Thompson testified, for the State, that J. G. McElroy, on the night of the killing of Owens, made an affidavit charging the defendant with an assault to murder, and witness issued a warrant upon the affidavit for the arrest of the defendant. The witness was the justice of the peace before whom the case of Musick v. The Missouri Pacific Railroad was tried, on the day of the killing. The defendant did not testify in that case. Witness saw the defendant standing in the door of the court room several times during the trial, but had no recollection of seeing him in the court room.

A. P. Padgitt testified, for the State, that J. G. McElroy, exhausted, wet and frightened, came to his house on the night that Owens was killed. He got there about moonrise. As he came into witness's house he exclaimed: "Save me! Save me!" He then told witness that deceased was killed and that the defendant had shot at him. Witness and McElroy were enemies, but under the circumstances the witness went with him to Jacksonville. The place of the killing was about a mile northwest from the witness's house. Witness lived on the railroad about four miles from Jacksonville. The State closed.

J. P. Boone, J. R. McAnnally, Tom Musick and Ben Musick testified, for the defense, that the road near which the defendant's house was located led into the main Jacksonville road about one mile from the house. That same road led by William Lowery's house. The defendant's house was about two hundred yards to the left of the road. About sunset, or a little later, the witnesses, who were in wagons, saw the defendant riding up the road to his house. He was alone. He spoke to the parties

about a wagon he was to get next day at Ben Musick's gin. Boone said that J. G. McElroy's reputation for truth and veracity was bad. McAnnally said that it had been bad, but had recently improved, and that he would now believe McElroy on oath, if his testimony was corroborated by circumstances.

Mrs. H. Musick testified, for the defense, that she was the defendant's wife. The defendant came home about dark on the night that Owens was killed. He ate supper and left, saying that he was going to Lon Lowery's house and stay all night, borrow a horse next day, and go to Tom Musick's gin to get a wagon with which to haul a bale of cotton to Jacksonville. He hitched his horse to the fence and did not feed him while at home. The defendant's shot gun was not then at home, but was in the hands of some one of the neighbors, witness did not know who, to whom it had been loaned several days before. When sheriff Reagan came to the house during the night, the witness became impressed with the idea that defendant's bondsmen on the railroad cases had surrendered him, and, acting upon that belief, she sent the defendant word to get out of the way. Witness denied that when sheriff Reagan and H. Rainey came to her house on that night she said that she told defendant that he had better stay at home that night, for the reason that, if McElroy was killed, the killing would be laid on him. She denied that she said she wished the defendant was in the Indian Nation.

Mrs. Ike Northcut testified, for the defense, that her residence was situated on the road which ran around the north side of Tom Musick's farm. The road one would travel going from Jacksonville to defendant's house forked near the defendant's house, one fork leading to defendant's house, north of Tom Musick's farm, and the other around the south side of Tom Musick's field. The two roads came together again about one and a half miles beyond defendant's house, near Tom Musick's gin. The road on which Owens was killed was south of the south fork described, about one and a half miles. Defendant passed witness's house a little after dark on the evening of the killing, and spoke to witness, who was then milking in the cow pen. Ike Northcut had then been home a few minutes. It was about three miles from the witness's house to the place of the killing. It was about two and a half miles northeast to Lon Lowery's house, and it was about one mile southwest from the witness's house to the defendant's house. Ben Musick, Tom Musick, brothers, and Ike Northcut, a

brother-in-law to the defendant, all lived within a mile of the defendant, and all of them owned work horses.

Hugh Cohen testified, for the defense, that he lived within two hundred yards of Lon Lowery. The witness started 'possum hunting about moon rise on the night of the killing. His wife and Bella Wimberly left home with him, and went as far as and into Lon Lowery's house. Witness did not stop at Lowery's, but went on to an old field beyond. About a half a mile beyond Lowery's, in the old field mentioned, the witness met a man who said that his name was Musick. That man was riding leisurely in a walk towards Lon Lowery's house.

Mrs. A. Wimberly testified, for the defense, that she lived with her brother, Lon Lowery, who was a single man. Lon Lowery got home just at moon rise on the night of the killing. He came home alone, riding leisurely. Witness's daughter, Bella, and Mrs. Cohen reached Lon Lowery's house about the same time. Lon brought the witness a dress from Jacksonville in his saddle bags. Between fifteen and twenty minutes after Lon got home the defendant arrived. He brought no gun with him. He said that he had eaten his supper at William Lowery's, and had come to stay all night. He did not say what he came for. Lon Lowery was arrested during the night. After he was taken off, witness found a package of shot and a package of powder in his saddle bags. They had not been opened up to that time, nor had they been opened since, and were still at witness's house.

Bella Wimberly testified, for the defense, that she went to Mrs. Cohen's house on the evening of the fatal Monday. She ate supper at Mrs. Cohen's house, and she and Mrs. Cohen went to Lon Lowery's house, starting just at moon rise. Lon Lowery came home just as witness and Mrs. Cohen passed in at the gate. Defendant arrived some twenty minutes later. Mrs. Cohen stayed at Lowery's fully an hour after the defendant's arrival. Defendant was at the gate when the witness first saw him. He then had no gun in his hand. Mrs. Cohen corroborated the witness, Bella Wimberly, in every particular.

Lee Jolly testified, for the defense, that he was at Mrs. Ike Northcut's cow pen, with Mrs. Northcut, when, as stated by Mrs. Northcut, the defendant passed and spoke to her just after dark on the night of the killing. Mrs. Hineman, who lived near the defendant, testified that, about good dark on the night of the killing, she heard the defendant at home, whistling and talking to his wife.

Sheriff John B. Reagan and others, called in rebuttal by the State, testified that they had tried the experiment of recognizing the features of a man in the dark by the flash of a pistol. If looking directly in the face of the party shooting at short range, his features could be recognized in and for an instant. Reagan stated that a man could ride a good horse four miles in twenty minutes, and fifteen miles in an hour. It was about four miles, through the woods and over the by-roads, from the place where Owens was killed to Lon Lowery's residence. An old road run direct from the place of killing to Lon Lowery's house. Defendant's wife told witness, at her house on that night, that she counseled her husband to stay at home that night because, if McElroy was killed, the killing would be laid on him. She also said, excitedly, that she wished her husband was then in the Indian Nation.

S. A. Thompson, justice of the peace, testified for the State in rebuttal, that the witness Cohen testified before him on the coroner's inquest over Owens's body, that he did not leave his house on the night of the killing, and that he saw no one on that night but the members of his family. A. G. Padgett, a member of the coroner's jury, testified as did the witness Thompson, with respect to Cohen's testimony before the coroner's inquest.

Charles McElroy, J. G. McElroy's brother, testified for the State, that some time after the blind mule was placed upon the railroad track, he had a talk with defendant about the match being ignited. Defendant said that he was afraid he had been "gulled" by Jack McIlroy. Witness went to defendant upon the request of Jack McElroy, to allay his fears, and to tell him that the match was struck by some of the boys to devil him; that Jack was "all right, and his friend." Defendant said in reply that if he knew, as a fact, that Jack had attempted to, or had led him into a scrape, he would kill him (Jack). Witness's explanation seemed to satisfy the defendant.

Marion George testified, for the State, that about two months before the killing of Owens he met Lon Lowery at a gin, and heard Lowery say that he had had a difficulty with Jack McElroy; that he was no friend to Jack McElroy, or any member of his family, and that there would be a hereafter. Witness did not know but that his remark was that he would get Jack McElroy hereafter.

The motion for new trial raised the question discussed in the opinion.

*P. F. Edwards* and *G. T. Ingraham*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

White, Presiding Judge.   It would seem to be clear, from the evidence in this case, that the parties (one of whom was this appellant) implicated in the murder of Owens, the deceased, intended to kill one McElroy, and not Owens.   The law applicable to this phase of the case was fully expounded by the trial judge in his able charge to the jury.   The rule of common law was that if A. shoots at B., with express malice, and by accident or mistake kills C., the offense would be what we call murder in the first degree.   Under our code, to constitute murder of the first degree, or rather a murder upon express malice, it must and can only be a malice directed towards the particular individual, and if another than the one against whom this malice is conceived and entertained be the mistaken victim of such malice, the crime is murder of the second degree.   (McCoy v. The State, 25 Texas, 38; Ferrill v. The State, 43 Texas, 503; McConnell v. The State, 13 Texas Ct. App., 390; Clark v. The State, 19 Texas Ct. App., 495.)

Supposed defects in the charge of the court are the only errors pointed out or complained of by appellant on this appeal.   We have read the charge carefully, and in our opinion it is all the law demands upon the facts of this case.

There is no error in this record, and forty years in the penitentiary is not excessive punishment when the facts connected with the murder, and the motives which induced it, are properly considered.   The judgment is in all things affirmed.

*Affirmed.*