19  495,
32  232

## [No. 2124.]

### AUSTIN CLARK *v.* THE STATE.

1. ACCIDENT — OFFENSES DEFINED. — Article 44 of the Penal Code declares that "no act done by accident is an offense except in certain cases specially provided for, where there has been a degree of carelessness or negligence which the law regards as criminal."

2. SAME. — Article 47 of the Penal Code declares that, " if one intending to commit a felony, and in the act of preparing for or executing the same, shall, through mistake or accident, do another act which, if voluntarily done, would be a felony, he shall receive the punishment affixed by law to the offense actually committed."

3. SAME — MURDER. — If one committing an assault with intent to murder another, accidentally kill a third party, he is guilty of murder in the second degree.

4. SAME — MANSLAUGHTER. — If, however, the act done is the unintentional homicide of a different person from the one intended, but without malice, and while the mind is under the immediate influence of sudden passion, arising from an adequate cause, such as anger, rage, sudden resentment or terror, rendering the mind incapable of cool reflection, the crime is manslaughter, because the one intended was manslaughter.

5. SAME. — INTENT is the essence of the crime, and when the intention and the act resulting from it are precisely the same, whether the fatal shot takes effect upon the party for whom it was aimed, or on some one else, the guilt is the same, except in cases of murder of the first degree, in which it is required that there must be express malice towards the person killed.

6. SAME — SELF-DEFENSE. — If a person shoots in necessary self-defense and accidentally kills a third person, he is guilty of no offense.

7. SAME — NEGLIGENT HOMICIDE. — With regard to negligent homicide, either of the first or second degree, the law requires that there must be no apparent intention to kill. And it is expressly provided by article 590 of the Penal Code, that "if one in the execution of, or in attempting to execute, an act made a felony by the penal law, shall kill another, though without an apparent intention to kill, the offense does not come within the definition of negligent homicide."

8. MANSLAUGHTER — CHARGE OF THE COURT. — See the opinion *in extenso* for a state of facts under which the trial court sufficiently charged the jury to the effect that, if they believed from the evidence that the defendant, at the time alleged in the indictment, assaulted one N. under such circumstances that, if he had killed N., the offense would have been manslaughter, and that while making such assault he accidentally shot and killed the deceased, he should be convicted of manslaughter. Note also that the facts proved did not raise the question of negligent homicide, wherefore special charges on the subject were properly refused.

APPEAL from the District Court of Grimes. Tried below before the Hon. Benton Randolph.

The appellant in this case, under an indictment which charged him with the murder of Henry Welden, in Grimes county, Texas,

on the 12th day of April, 1884, was convicted of manslaughter, and was awarded as punishment a term of three years in the penitentiary.

Doctor John Buchanan was the first witness sworn by the State. He testified that on the morning of April 13, 1884, he examined the wound upon the body of the deceased. He was shot through the right breast and in the liver. The wound was unquestionably mortal.

Cross-examined, the witness stated that the skin of the deceased was powder-burned, indicating that, when the fatal shot was fired, the muzzle of the gun was held very close to the body. There was but one wound, which was circular in shape and ragged at the edges. The ball ranged a little downward. From the position of the wound it was evident that the deceased and his slayer were facing each other when the fatal shot was fired.

Coleman Nowlin testified, for the State, that Henry Welden was shot on Saturday, April 12, 1884, and died on the next day at J. C. McIntyre's place, in Grimes county, Texas. Witness knew the defendant, from whose house he lived some seven hundred or eight hundred yards distant. Witness, who had been to mill on that Saturday, reached home about sundown. He asked his children on his arrival where their mother was. They told him that she was at Welden's. Witness then saw her and defendant at the gate talking. Witness went up to where they were, and asked Clark, defendant, if he had said that witness threw his mule in the ditch and killed it. Defendant replied: "No, I did not say it, but I am going to kill you." Those present at the time were Rose Moore, the deceased and his wife, defendant and his wife, and witness and his wife. Defendant then rolled up his sleeves to fight witness. He next caught up a stone, but deceased took it from him. He then got a piece of a rail, which deceased took from him after he started towards witness with it. The wives of the witness and the defendant then became involved in a quarrel. Witness's wife out-talked defendant's wife, when defendant's wife called witness's wife a bitch. The defendant said: "My wife is no more of a bitch than yours is," and ran to his gun. Deceased got the gun. Defendant cried to him: "Turn it loose; I am going to kill the yellow son-of-a-b—h,"— or perhaps " sons-of-b—hs." Deceased had hold of the muzzle of the gun, which the defendant held at the stock end. The gun was discharged and killed deceased. The deceased's sole part in the affair was to prevent a quarrel. He had no quarrel with the defendant. Witness had no weapon of any kind, nor did he use or attempt to

use a weapon. Witness did not assault or strike, or attempt to assault or strike, the defendant. Witness did nothing but attempt to prevent the defendant from injuring him. Defendant was neither scratched nor bruised during the fracas. Witness went off for a doctor to attend the deceased.

Cross-examined, the witness said that he and the defendant were friendly before the difficulty. The difficulty occurred between sundown and dark. When defendant said that he was going to kill witness, he laid his gun down on some grass. It was some fifteen feet from where the fatal shot was afterwards fired to the point where the defendant first laid his gun down. Witness supposed that the gun was moved by the deceased when the quarreling first began. With the report of the gun, defendant said to witness: "Turn me loose; Welden is shot." The gun dropped and witness picked it up, and presently, by his request, gave it to the defendant. The rock was picked up by defendant before the fight between the women, and the rail afterwards. The women fought for some time. Witness's wife got defendant's wife down, and witness and defendant parted them.

Hester Welden testified, for the State, that the deceased was her husband. Harriet Nowlin, the wife of the witness Coleman Nowlin, said that she wanted to see Aus. Clark. When she met him she asked him if he had accused her husband, Coleman, of killing his mule. Defendant replied: "No; but I intend to kill him." Defendant caught up, apparently for use, first a rock, then a rail, and then his gun. Deceased caught the gun, when defendant said to him: "Turn it loose; I want to kill the d—d yellow son-of-a-b—h." Coleman Nowlin was of a lighter color than deceased. Coleman Nowlin's wife and defendant's wife went to fighting as soon as they met. Defendant's wife called Coleman's wife a "d—d yellow-legged b—h." Defendant then said: "My wife is no more of a bitch than yours." Coleman replied: "Don't you call my wife a b—h." No one but defendant, deceased and Coleman Nowlin had hold of the gun. Coleman did nothing but dodge behind the deceased during the scuffle.

Cross-examined, the witness said that the parties met at the gate. The women fought after the defendant picked up the rock and rail. No one had hold of the gun when it was discharged except the defendant. As soon as the gun fired defendant threw it down and ran off, and his wife picked it up and ran into the house with it. Witness did not hear the defendant say to Coleman: "Turn me loose; the man is shot."

Re-examined, the witness said that defendant's remark, when deceased caught the gun, was: "Turn the gun loose; I want to kill Coleman." The gun went off and shot deceased. Deceased told defendant and Coleman to part their wives, and they did so. Defendant did not ask Coleman for the gun after the shooting. His wife took the gun into the house.

Rose Moore testified that she was present and saw the difficulty in which the deceased was killed. The defendant has just returned home from hunting, when he was accosted by Harriet Nowlin with the question; "Did you say that my husband ran your old horse into a ditch?" Defendant replied that he did, picked up a rock and then a rail, and then the wives of the defendant and Coleman Nowlin engaged in a fight. The defendant called Coleman Nowlin's wife a long-legged yellow bitch, when Coleman ran at him and said: "You call my wife a bitch!" Defendant ran too, and got his gun. Deceased caught the gun, when defendant said that he was going to kill the yellow son-of-a-b—h. They struggled over the gun — defendant at the stock and deceased at the muzzle. Coleman had the gun about the center. Deceased was endeavoring to suppress a fight. Coleman Nowlin did not strike the defendant during the fracas. Witness was related to none of the parties.

Cross-examined, the witness said that Coleman Nowlin had one hand on the defendant's shoulder when the gun was discharged. He was saying something to the defendant at the time, but witness could not hear what it was. The discharge set fire to deceased's clothing and the defendant extinguished it. Witness then told defendant he had better summon some one to do something for deceased, and defendant left at once for Jerry Shelton's house for help. The State closed.

Fannie Clark, the wife of the defendant, testified, in his behalf, that the defendant and the deceased's little boy went hunting together on the day of the killing. On his return home the defendant went into his yard to shoot a rabbit. Harriet Nowlin called him to the gate, and asked him if he had accused her husband, Coleman, of throwing his horse into a ditch and killing him. The defendant replied simply: "No, I did not." While they were at the gate Coleman Nowlin came up. Harriet Nowlin then struck the witness, an I she and witness engaged in a fight, and were separated by their husbands. Harriet called witness a bitch, and defendant said to Harriet: "My wife is no more of a bitch than you are." Thereupon Coleman Nowlin struck the defendant; defendant struck back, and several blows were passed. Defendant then caught up his gun.

Deceased caught hold of the gun at the other or muzzle end. Coleman Nowlin seized the gun in the center, and worked his way to defendant and caught defendant from behind. The gun was then discharged, shooting the deceased.

Cross-examined, the witness said that Nowlin did strike the defendant. The defendant at no time during the difficulty picked up a rock and a rail. He did not say that he would kill Coleman. He did not tell deceased to turn the gun loose and that he wanted to kill the "yellow son-of-a-b—h." Coleman had the gun in the middle just before it was discharged. Deceased had nothing whatever to do with the quarrel. Just before defendant caught up his gun Coleman Nowlin thrust his hand in his pocket as if to draw a knife, but witness saw no knife. Defendant, deceased and Nowlin lived on the same farm and were friendly with each other prior to the difficulty. Witness had not discussed this case with the defendant nor any one else.

Jerry Shelton testified, for the defense, that on Sunday morning, after the doctor left, the deceased, in witness's presence, told the preacher that he could not possibly recover. Later on the same day witness asked deceased if defendant shot him on purpose. Deceased replied: "No, he did it accidentally." Deceased then turned in his bed, spoke no more, and died within two or three hours.

Cross-examined, witness said that he asked the question of the deceased because he saw the near approach of his death, and wanted to know the truth about the matter. Defendant was not related to the witness, but was an orphan boy raised by the witness's mother.

J. L. Dickson testified, for the defense, that about 1 o'clock on the morning of April 13, 1884, the defendant came to his house, waked him up, and told him that he had accidentally shot the deceased in a struggle with Coleman Nowlin, and surrendered himself to the witness, who was then the justice of the peace.

Doctor Uriah Haynie testified, for the defense, that he had known the defendant about six years, during which time they had resided in the same neighborhood. He knew his general reputation in the neighborhood during that time to be good as a quiet, peaceable, law-abiding boy. John P. Roan and Sam H. Garvin testified substantially as did Doctor Haynie.

In rebuttal, the State introduced the testimony of Fannie Clark as reduced to writing, on the examining trial. It reads as follows:

"I am the wife of the defendant. The defendant saw a rabbit in the yard and got his gun and went out there to shoot it. Defendant went hunting on that evening with Hester Welden's little

boy. The sun was setting when the defendant and the boy got back. While the defendant was in the garden, Harriet Nowlin called him. They were standing up there talking, and while they were talking Coleman Nowlin came up. I went up there at that time. Coleman Nowlin said to the defendant that he had been running over him long enough, and that he intended to put a stop to it. Defendant said that he had not bothered him, and asked how he could bother him when he had not been about him. Coleman Nowlin had a rock in his hand. Defendant's gun was lying on the ground, and he picked it up, and Coleman kept making up to him. Defendant said: "Don't come up to me," and at that time Henry Welden, the deceased, came up and took hold of the gun, and then Coleman came up and caught the gun between the deceased and the defendant, and kept working until he got behind the deceased. When the gun fired Coleman Nowlin had it in his hands, for I tried to get it away from him. I did not see my husband roll up his sleeves. The sun was down when me and Harriet had the fight, and that was before the shooting. Coleman Nowlin's wife, after our fight, called me a bitch. The defendant then said: "My wife is no more a bitch than your wife." Coleman and defendant went to fighting again. My husband only owns two sows and two pigs."

Cross-examined. "Defendant told me he was going out to shoot a rabbit. I did not see the rabbit. I don't know who shot the gun. Defendant was out in the pasture when Mrs. Nowlin called him. The gun was lying flat on the ground when I went up to where they were. At the time of the shooting, I was in a manner right close to them. Coleman Nowlin was not at the deceased's back when the gun fired. I did not say that he was at the deceased's back when the gun fired. Coleman Nowlin was at the defendant's back when the gun fired, and had hold of the defendant and of the gun. I don't know which hand Coleman had the gun in. I was not excited, but was perfectly cool."

Re-examined. "I don't know what defendant means. I do know that Coleman Nowlin was at Austin Clark's back when the gun fired, and was not at Henry Welden's back. Coleman Nowlin, Henry Welden and my husband were struggling over the gun at the time it fired. I don't know who shot the gun. Just after the shot Coleman Nowlin had the gun, and I ran up to take it away from him, and he, Coleman Nowlin, told me I should not have it, and at that time my husband was turning Henry Welden over, putting out the fire. It was about eighty or a hundred yards from where my husband had the gun to kill the rabbit to where the kill-

ing took place, and near the trail from Hester Welden's house to our house, and it is all in the same pasture."

The motion for new trial raises the questions discussed in the opinion.

No brief for appellant has reached the Reporters.

*J. H. Burts,* Assistant Attorney-General, and *N. G. Kittrell,* District Attorney Twelfth Judicial District, for the State.

WHITE, PRESIDING JUDGE.— A fight had occurred between the wives of appellant and one Coleman Nowlin. Just after they had been separated, appellant called Nowlin's wife "a long-legged yellow bitch." Nowlin ran up to defendant and asked him if he called his wife a bitch, at which defendant ran and picked up his gun, and said he was going to kill the yellow son of a bitch. Deceased Welden caught hold of the muzzle of the gun to prevent defendant from shooting Nowlin, and Nowlin also got hold of the barrel of the gun. The three parties were struggling over the gun when it was discharged, the contents entering the right breast and liver of Henry Welden, who was a friend of both the other parties, and who, when shot, was endeavoring to get the gun in order to prevent either of them from shooting the other. Welden died the next day. Appellant was tried for his murder, and was found guilty of manslaughter, with punishment affixed at three years in the penitentiary. From this judgment his appeal to this court is taken.

Upon the law of manslaughter as applicable to the facts proven, the charge of the court was: "If you shall believe from the evidence that the defendant, at any time within three years next before the said 28th day of May, 1884, did then and there assault said Coleman Nowlin under such circumstances as, if death had ensued, it would have been manslaughter as hereinbefore defined, and that, while making said assault, he accidentally shot and killed said Welden, then you will convict him of manslaughter," etc. Charges were also given upon the law of self-defense and reasonable appearances of danger.

Defendant's special instructions, which were refused, in so far as they were applicable and not embraced in the general charge, were substantially: "1. If the jury shall find from the evidence that the deceased was accidentally or unintentionally killed, they will acquit the defendant." "2. If the jury shall find from the evidence that at

the time the fatal shot was fired the defendant did not intend to shoot the deceased, but that the intention was to commit an assault upon the witness Coleman Nowlin, the defendant would in such case be guilty of negligent homicide, and not murder or manslaughter."

" 3. Insulting words or conduct of the person killed towards a female relative of the party guilty of the homicide is adequate cause sufficient to reduce murder to manslaughter; and in this case, if you shall find from the evidence that Harriet Nowlin, the wife of Coleman Nowlin, in the presence of said Nowlin called Fannie Clark, defendant's wife, a bitch, and the said Nowlin did, by words and acts then used, confirm the words of his said wife, and the same were the cause of the homicide, then, had Nowlin died, defendant would, if you shall so find, be guilty of manslaughter, and in this case defendant would be guilty of negligent homicide in the second degree."

Accidents are provided for specially by our statutes, which declare that " No act done by accident is an offense except in certain cases specially provided for, where there has been a degree of carelessness or negligence which the law regards as criminal." (Penal Code, art. 44.) But, "If one intending to commit a felony, and in the act of preparing for or executing the same, shall, through mistake or accident, do another act which, if voluntarily done, would be a felony, he shall receive the punishment affixed by law to the offense actually committed." (Penal Code, art. 47.)

If A. shoots at B. with express malice, and by accident kills C., the offense is murder of the first degree. This is not because of any malice in fact against C., but because of the evil design against B., which, it is said, is carried over against C. by legal implication. (4 Black. Comm., 201.) This rule of the common law is, however, qualified and modified by our statute. (*McCoy* v. *The State*, 25 Texas, 33.)

If one committing an assault with intent to murder another accidentally kill a third party, he is guilty of murder in the second degree. (*McConnell* v. *The State*, 13 Texas Ct. App., 390, and authorities cited.) But if the act done is the unintentional homicide of a different person from the one intended, but without malice and while the mind is under the immediate influence of sudden passion arising from an adequate cause, such as anger, rage, sudden resentment or terror, rendering it incapable of cool reflection, the crime is manslaughter, because the one intended was manslaughter. " The intent is the essence of the crime, and when the intention and the act resulting from it are precisely the same, whether the fatal shot takes effect upon the party for whom it was aimed or on some one

else, the guilt, it would seem, should be the same,"— except in cases of murder of the first degree, where it is required there must be express malice towards the party killed. (*Ferrell* v. *The State*, 43 Texas, 503.) If a party shoots in necessary self-defense, and accidentally kills a third person, it is no offense. (*Plummer* v. *The State*, 4 Texas Ct. App., 310.) With regard to negligent homicide, either of the first or second degree, the law is that "there must be no apparent intention to kill." (Penal Code, art. 584; *Robbins* v. *The State*, 9 Texas Ct. App., 667, and 671; *Aiken* v. *The State*, 10 Texas Ct. App., 610.)

And it is further provided that, "when one in the execution of, or in attempting to execute, an act made a felony by the penal law shall kill another, though without an apparent intention to kill, the offense does not come within the definition of negligent homicide." (Penal Code, art. 590.) Under the facts we have stated, when the law is applied, we think it must plainly appear that appellant was, when he seized the gun with which the homicide was committed, either acting in his own proper self-defense or that he seized it intending to kill Nowlin, because Nowlin had by his acts and conduct excited him to a degree of passion which rendered his mind incapable of cool reflection. As to self-defense, the question was fairly submitted under appropriate instructions to the jury. If he was intending to kill Nowlin, then, no matter what the condition of his mind might be, provided he was not acting in his proper and legitimate self-defense, he was perpetrating a felony, and there could not in that event be a question of negligent homicide as to the act committed. The question of an intention only to commit an assault upon Nowlin, short of taking life, does not, we think, arise upon the evidence. Defendant's language and acts, when he seized the gun, indicated most plainly an intention to kill Nowlin, and not simply to assault him. Under the facts proven and the law, we are of opinion the law of the case was fully and fairly stated in the charge given by the court to the jury, and that the special requested instructions were not applicable to the facts of the case. Hence the court did not err in refusing them.

We have been unable to find any error in the record for which the judgment should be reversed, and it is therefore affirmed.

*Affirmed.*

[Opinion delivered December 2, 1885.]