Opinion delivered November 17, 1886.

[No. 2355.]

## Eli McConnell *v.* The State.

1. PLEADING—MURDER—INDICTMENT.—It is a well settled principle of criminal pleading that if, eliminating surplusage, an indictment so avers the constituents of the offense as to apprise the defendant of the charge against him, and enable him to plead the judgment in bar of another prosecution, it is good in substance under our code. See the opinion *in extenso* for an indictment with surplusage eliminated by the court, *held* sufficient to charge murder in the first degree; and see the statement of the case for the charging part of the indictment in full.

2. SAME—EVIDENCE.—It was objected by the defense, in a murder trial, that the court erred in permitting the State to prove by four witnesses the condition of the body of the deceased after exhumation. Two witnesses present at the exhumation of the body having testified to its condition when they saw it, the State was permitted to prove its condition by two other witnesses, one of whom was a physician. *Held*, that there was no error in the action of the trial court.

3. SAME—PRIVILEGE OF COUNSEL.—The abuse of the privilege of argument by counsel, in order to authorize a reversal of a conviction, must appear to have been so gross in the use of words, terms and epithets unwarranted by the evidence that they were calculated to injure materially· the rights of the defendant. See the opinion *in extenso* for the remarks employed by the State's counsel, *held*, though reprehensible, not to constitute, *per se*, such an abuse of ·the privilege of argument as to require the reversal of the conviction.

4. SAME—INSANITY—CHARGE OF THE COURT properly omitted to instruct the jury upon the law of insanity, when there was a total absence on the trial of any evidence tending to raise that issue.

5. SAME—NEGLIGENT HOMICIDE OF THE FIRST DEGREE.—Trial courts are required by statute to charge the jury upon the whole law of the case, and it becomes imperative upon the court to instruct upon every phase of case raised by the evidence, however impotent such evidence may appear to be. Exception to an omsision to charge the whole of the law devolves upon this court the duty of reversing a conviction without inquiry as to the effect of such error upon the trial. See the statement of the case for evidence *held* to demand of the trial court a charge upon the law of negligent homicide of the first degree.

APPEAL from the District Court of Parker. Tried below before the Hon. A. T. Watts, special judge.

The verdict in this case found the appellant guilty of manslaughter, and awarded him a term of four years in the penitentiary, under an indictment for murder, the charging part of which reads as follows, the words eliminated by this court being in italics:

"* * * that one Eli McConnell, late of said county, on, to wit, the fifteenth (15) day of November, A. D. 1882, in said county of Parker, and State of Texas, *not having the fear of God before his eyes, but being moved and seduced by the instigation of the devil*, and of his malice aforethought contriving, and intending one Viola Hunt McConnell to deprive of her life, did then and there with force and arms make an assault upon the body of the said Viola Hunt McConnell, and a certain pistol, the same being a deadly weapon, which he, the said Eli McConnell, in his hands then and there had and held, which said pistol as

aforesaid was charged with gunpowder and leaden bullets, he, the said Eli McConnell, did then and there discharge and shoot off to, at and against her, the said Viola Hunt McConnell, *a female child in being within the State of Texas aforesaid, feloniously, wilfully, and his, the said Eli McConnell's, express malice aforethought, inflict one mortal wound in and upon the head of her, the said Viola Hunt McConnell, of which said mortal wound she, the said Viola Hunt McConnell then and there died.* And so the grand jurors aforesaid, upon their oaths aforesaid, do say that the said Eli McConnell, in manner and form aforesaid, feloniously, willfully and of his express malice aforethought, did kill and murder the said Viola Hunt McConnell; contrary to the law, and against the peace and dignity of the State."

Justice of the peace John W. Squyres was the first witness for the State. He testified that he held an inquest upon the body of a child in the H. B. McConnell neighborhood, on or about December 1, 1882. H. B. McConnell, the defendant's father, then lived about sixteen miles southeast of the town of Weatherford, in Parker county, Texas. The witness, with a party of citizens, went to the McConnell family graveyard, and found the newly made grave of a child. Witness organized a coroner's jury at once, and caused the grave to be opened. It was found to contain the body of a female child, about eighteen months of age. The body had been buried but a short time. It was nicely and carefully buried in a coffin. A white bandage was tied around the head. The bandage being removed some small pads were found to cover wounds on each side of the head. Those wounds, in the judgment of the witness, were made by the passage of a gun or pistol ball through the child's head. The ball appeared to have entered the left side of the head, just above and a little in front of the left ear. It passed out on the right side of the head, a little higher up and a little farther back. The child was neatly dressed, and was buried with its head towards the east. Doctor P. G. Legrand and Messrs. Echols and Medford were present at the inquest.

E. B. Medford, the next witness for the State, testified that he was a member of the coroner's jury. He corroborated the witness Squyres as to the exhumation of the remains, its examination and condition.

Mr. Echols was the next witness for the State. He testified

that in November, 1882, he lived near H. B. McConnell's house and family grave yard. About ten o'clock a. m., on or about the fifteenth day of that month, the witness was sent for to go to H. B. McConnell's house, and aid in the burial of defendant's child. Arriving at the grave yard he helped dig the grave. When he reached the house he met and remarked to the defendant: "I suppose your child is dead?" Defendant replied: "Yes," and said nothing more. Defendant's brother in law, William Fain, was with defendant, and brought the body to the grave. The body was buried in the usual and customary manner. A week or two later the witness was present at and witnessed the exhumation of the body of a child from the same grave in which defendant's child was buried, and for the first time noticed that the body was buried with the head to the east. Over the defendant's objection the witness then testified to the exhumation, examination and condition of the body, as testified by the witnesses Squyres and Medford.

Doctor P. G. Legrand was the next witness for the State. He testified, over the defendant's objection, to the facts incident to the exhumation of the body, its examination and condition, as they were stated by the three previous witnesses, and, in addition, that he had practiced medicine in the defendant's family and knew his child in its lifetime. It had been his impression that he once vaccinated the child, but it might be, as he was informed, that he was mistaken. It was quite possible that he would not have recognized the body when it was taken from the grave, as that of the defendant's child, had he not known the reason why he was summoned to the grave at the time of the exhumation. The witness found and probed a wound in the head of the body. It was made by the passage of a gun or pistol ball through the head. The ball entered the head just above and in front of the left ear, passed through the brain and out nearly opposite the point of entry, or just above and a little back of the right ear. That wound must certainly have produced the instantaneous death of the child. Witness saw no powder burn about the body. Medical authority maintained that powder discharged from a fire arm will not burn or discolor at a greater distance than eleven feet. The wounds on the body were neatly dressed. Defendant always appeared to be very fond of his children.

Mrs. Virginia Wilson testified, for the State, that she and Colonel Hindman were at the defendant's house on the fifteenth

day of November, 1882, when, between four and five o'clock
p. m., the defendant and his wife and their eighteen months
old child, Bidie, started in a buggy, to go to the house of defend-
ant's father, on Bear creek.   The witness was at the defendant's
house to stay with his children during the absence of himself,
wife and child.   The witness never afterwards saw the child,
Bidie, alive.   Just before starting, the defendant took a pistol
from the pocket of a coat hanging up in the house and put it in
one of the pockets of the clothes he wore.   He also had a pint
flask of whisky.   The witness tried to get the defendant to give
her the pistol, but he refused to do so.   Colonel Hindman made
a subsequent effort to get the pistol, but the defendant refused
to surrender it.   When ready, defendant said to his wife: "Go
out and get into that buggy."   As she passed witness, going to
the buggy, Mrs. McConnell said to witness: "Pray for me."   She
then said that she would not get into the buggy unless defend-
ant surrendered his pistol.   He touched the pocket in which he
had the pistol and said: "It will not hurt me or mine."   He ap-
peared angry and excited.   Mrs. McConnell, with her child,
Bidie, then got into the buggy and were soon driven of by the
defendant.

The defendant and his wife returned to their home  between
eight and nine o'clock on the next evening.   As they entered the
house witness remarked: "Well, you have got back."   The de-
fendant replied: "Yes, but we didn't bring little Bidie with us."
The witness expressing surprise, the defendant said: "She is
dead and buried."   He then proceeded to tell the witness that
the buggy was overturned in Bear creek, when they attempted
to cross it on the evening before; that the child fell on the rocks,
under its mother, and was killed, and that the fall on the rocks
bruised Mrs. McConnell, she having made an effort to shield the
child from the rocks.   The witness afterwards saw bruises and
gashes on Mrs. McConnell's head.   Mrs. McConnell was present
when defendant made the statement about the death of the
child, but said nothing.   She had on a bonnet at the time. and
occasionally shook her head.   Witness suspected nothing wrong
at the time.   She knew none of the particulars of Bidie's death
at the time, and supposed that Mrs. McConnell shook her head
with suppressed grief.   Mrs. Judge Hunter was present during
part of this conversation.   The witness afterwards talked to de-
fendant about the death of the child.   He said that whisky was

the cause of its death, and that he would never again touch whisky.

On her cross examination, the witness said that she now lived in Lee county. She was present as a witness in this case because she was under bond to appear, and because the county attorney wrote to her that she had better be on hand. Witness's present name was Wilson; before Wilson. it was Johnson; before Johnson, it was Pigg; before Pigg, it was Trout; before Trout, it was ——, which was her maiden name. The witness was not now living with her last husband, and besides him, she had two living husbands, from whom she was divorced. It was the recollection of the witness that on a former trial of this case she testified that Mrs. McConnell was shaking her head while defendant was telling witness about the manner of Bidie's death. The witness was a frequent visitor at the defendant's house prior to the said November 15, 1882. Defendant, prior to that day, had always appeared agreeable to his wife and children, and, indeed, much attached to them. Defendant took whisky with him when he started to his father's house, on the evening of November 15, 1882, and it was the witness's opinion that he was somewhat in liquor when he left. The witness did not know as a fact that the defendant was addicted to drink. She had never seen him take a drink of liquor.

The first that witness knew of trouble existing between defendant and his wife was about the time they started to defendant's father's house. That trouble, as the witness understood, arose from the interception by defendant of a letter written by his wife to Bud Elliott. Their visit to old man McConnell's, witness understood, was to settle the controversy that grew out of that affair. Defendant appeared to be greatly troubled by the letter. The witness knew nothing about Bud Elliott—who he was, nor where he lived. Colonel Hindman heard the conversation between witness, McConnell and his wife on the eve of defendant's visit to his father with his wife and child. Ella Henderson and Jeff Hunter were present and heard defendant's statement to witness about the buggy overturning in Bear creek and killing the child.

Mrs. Judge Hunter testified, for the State, that she was at the defendant's house when the defendant and his wife returned from old man McConnell's, and she was at the defendant's house again on the next evening. But little, if anything, was said in the presence of the witness on the first evening, but on

the next evening the defendant told the witness that the buggy turned over on some rocks and killed the child. Mrs. McCon-nell was present, weeping, apparently, very much grieved and moved her head occasionally, but said nothing. Mrs. Wilson was at the defendant's house on both evenings, but, according to the recollection of the witness, was in the kitchen, and did not hear defendant's statement to the witness on the second evening. Defendant said, further, that the child was killed by accident; that his wife, in trying to save the child, got hurt, and that he himself got his forehead bruised—calling witness's attention to a bruise on his forehead. Both defendant and his wife appeared to be in very great distress. Defendant remained with his wife all of the next day and pretty much all of the time until he left. Mrs. McConnell was taken sick on the day after her return from Bear Creek and had to call in a doctor. She told her husband that she would be compelled to have her hair cut. He asked her, then, if he should write to "Dora," and she replied in the affirmative. Witness combed Mrs. McCon-nell's hair and found her head badly cut and gashed, the gashes being filled with dried blood. The witness could not tell how deep the wounds were.

On her cross examination, the witness testified that she could not say that Mrs. McConnell was "shaking" her head during defendant's recital of the accidental death of the child, but she moved it about from side to side occasionally. Witness thought nothing at the time about the movement of Mrs. McConnell's head, and did not at the time take it as a denial of defendant's statement.

Mr. Kinzey testified, for the State, that he was living on the place of Mr. Staggs, in November, 1882, at the time of the death of the defendant's child. The witness and Mr. Staggs were dig-ging potatoes in Staggs's field, on the evening of the fifteenth day of that month, when a buggy passed in sight along the road. The witness's attention was attracted by a noise which sounded to him like the scream of a woman or child. A man then got out of the buggy and walked back over the road as if to get something dropped from the buggy. Some person in the buggy plied the whip to the horses and drove off over the road and away from the man in a very rapid pace. The man turned and pursued the buggy, running, and presently the witness heard three shots fired. When those shots were fired, both the buggy and the man had passed out of the sight of the witness. This

all occurred about a quarter of a mile from Staggs's house, in the direction of Weatherford. When the witness last saw the buggy, the horses were at a full run, the man running between fifty and a hundred yards behind.

William Staggs, the next witness for the State, testified, in substance, to the same facts testified to by the witness Kinzey, and in addition that, after the shooting, the defendant came to his, witness's house and called him to the gate, and, in the course of the conversation which ensued, told him that he was worried over domestic troubles which had just been discovered by him. He then said that his wife, while en route to his father's on Bear creek, either threw or dropped her hat from the buggy, and that, when he got out of the buggy to get it, his wife plied the whip to the horses and ran off from him; that he shot at the horses, trying to cut one of them down. This, he said, occurred between sun down and dark. The buggy top was up when witness saw it on the road and at his house. Defendant occupied the right hand seat and Mrs. McConnell the left hand seat. From witness's house the buggy went towards Tom Odell's. Within twenty minutes after the buggy passed witness's house he saw it going back towards Weatherford.

Mrs. Staggs testified, for the State, that Mrs. McConnell ran into her house on the evening of November 15, 1882, with her child in her arms, and asked witness for protection from her husband, who, she said, had been beating her. She asked witness to lock her up in a room. Witness replied that she was afraid to do that, but would call her husband. Defendant reached the house in a few minutes. He did not appear to be drunk, but looked like he was in a rage. He said that his trouble was over family matters; that if witness would give him the child, which he believed to be his, Mrs. McConnell could go; that Mrs. McConnell was an impure woman, and unfit to associate with decent people, and that witness ought to turn her out of the house. Mrs. McConnell would not agree that the child should be given to defendant, but asked witness to exact a promise from defendant not to abuse her any more, upon which promise she would go on with him. Finally Mrs. McConnell agreed to go with the defendant, and got into the buggy. As he got into the buggy the defendant remarked: "This is not ended yet." Witness's husband reached the house before defendant and his wife and child left. Witness's son afterwards found a woman's hat and some false hair on the road near the place

where the pistol was said to have been discharged. There was nothing the matter with the child while at witness's house. It drank heartily of a cup of milk, and appeared to be in perfect health.

Mrs. Dora McCloskey testified, for the State, that she was a sister of the defendant's wife. Mrs. McConnell was now dead. Defendant and his wife had an infant daughter, aged about eighteen months in November, 1882, when she came to her death. The witness had no personal knowledge of the particulars of the child's death. The defendant wrote to witness on the eighteenth day of November, 1882, asking her to come to Weatherford at once, and stating that his baby was killed and his wife severely injured by the accidental capsizing of a buggy. Witness went to Weatherford immediately, and upon her arrival heard of the trouble between the defendant and his wife. Mrs. McConnell was in bed when witness reached her. Witness slept but little during that night. At breakfast on the next morning the defendant told witness to eat heartily so that she might feel well, as he had a great deal to tell her. In the course of the conversation which followed breakfast, the defendant told witness that he killed his child, but that he did it accidentally. When witness asked him: "Why didn't you kill Alex?" (his wife) he replied: "I did intend to, but I had no more cartridges."

Cross examined, the witness stated that she went to Weatherford at the instance of the defendant. As often as she had attended court to testify in this case, she had come as an attached witness. The witness at times felt sorry for the defendant. At other times she felt towards him as bitterly as any demon could feel. The witness was here shown the letter subsequently identified by the witness Hindman, and testified that it was in the hand writing of her sister, the late Mrs. McConnell. The child said to have been killed by defendant was named Viola Hunt McConnell, but was called Bidie.

William Fain testified, for the State, that in November, 1882, he lived with H. B. McConnell, the defendant's father, on Bear creek, in Parker county, Texas. On the evening of November 15, 1882, defendant and his wife came to H. B. McConnell's house, bringing their dead child, Viola, with them. The defendant said nothing to witness about the child's death. He gave witness some money and asked him to take the buggy back to McGehee, the livery stable man in Weatherford, and bring him a coffin for the interment of his child. Witness took the buggy

and team back to McGehee, got another team and took a coffin to defendant on the same night. Witness assisted in the burial of the child. There was no purpose in burying the child with its head to the east. Defendant did not request that it be so buried. It was simply a mistake on the part of those burying it.

C. W. McGehee testified, for the State, that he was the proprietor of a livery stable in Weatherford, Texas. On the fifteenth day of November, 1882, the defendant hired a buggy and team from the witness to go to his father's house in the southeast portion of Parker county. He was to return on the same night. Some one, the witness did not know who, brought the buggy and team back that night, and got another early on the next morning. When the buggy used by the defendant got back, the witness observed a hole in it which he was satisfied was made by a bullet. That hole was in the top of the buggy, just over and a little in advance of the right hand seat, the bullet going in from the under side. Witness observed also a dent made, as he believed by a bullet, on the second bow of the buggy top from the rear, on the left hand side of the buggy, about a foot or a foot and a half from the back of the buggy. The dent would be about even with the lower part of the chest of a person sitting on the left hand seat. The witness did not see defendant again until the fourth or fifth day after he hired the buggy, when he came to the stable to pay for the use of the team. He told witness that the buggy was accidentally upset in Bear creek, and the child killed.

Cross examined, the witness stated that he first noticed the hole and dent in the buggy on the morning of November 16, 1882. The next man to use the buggy was a drummer. The dent on the buggy bow was the graze of a ball, and was not the result of the rebound or ricochet of the ball that made the hole in the top. The balls appeared, from the holes, to have been fired from the direction of the right fore wheel.

Bascom Price testified, for the State, that a few days before the death of the defendant's child, the defendant told him that he wanted to purchase a number one saddle horse. The witness sold him an extra good saddle horse, an animal capable of traveling seventy-five miles per day if necessary, for one hundred and fifty dollars. The witness observed no disorder of the defendant's mind at that time nor afterwards, but thought the defendant was drinking some.

Henry Sisk testified, for the State, that he arrested the defend-

ant in Brown county, Texas, on or about the first day of December, 1882. He found him in bed at the house of a Mr. Wheeler, which house was situated in a secluded place, remote from other habitation or public road. The black horse once owned by Bascom Price was standing in the lot. Defendant exhibited much surprise when he recognized witness's voice, and greater surprise when witness told him that the body of the baby had been exhumed. Wheeler's house, in Brown county, was about one hundred and twenty-five miles from Weatherford, Parker county, Texas. The State closed.

Thomas Odell was the first witness for the defense. He testified that he lived on Bear Creek, in Parker county, two and a half miles beyond the house of William Staggs. Shortly after dark on the fifteenth day of November, 1882, the defendant drove up to the witness's gate, and asked about the road, with regard to which he said he had become confused. The witness stood near the buggy and talked to him. His wife and child were then with him, his child alive and apparently well. It cried in a natural voice.

Cross examined, the witness testified that it would require but few minutes to drive from Stagg's house to his. The defendant was off the road when he reached the witness's house. He was thrown off no doubt by a new fence which witness had recently built, and which changed the roads somewhat. Witness put him in the road, and as he left he remarked: "Tom, you don't know what all this means; if you live long enough you'll find out." The defendant appeared unnatural and excited, and, in the witness's opinion, was in liquor. An hour or two later the buggy passed back over the road, going towards Weatherford. Bear creek was between the houses of the witness and H. B. McConnell.

Colonel Hindman was the next witness for the defendant. He testified that he knew the defendant and his wife in November, 1882. Mrs. McConnell died about three months before this trial. The recollection of the witness was that defendant nursed and cared for his wife through her last illness. She died of consumption. The witness was at the defendant's house when he, his wife and child started to H. B. McConnell's house on November 15, 1882,—the day on which the child came to its death. Miss Henderson and Mrs. Wilson were also present. The defendant was in a very reckless condition of mind, and under the influence of whisky. For several days before the said November 15,

1882, the defendant appeared to be in very great distress of mind. That condition of mind arose from a letter which he claimed to have intercepted in the hands of his little boy, who was going to the post office with it. The letter exhibited was the letter referred to by the witness. The defendant sent for the witness as a friend when he got possession of the lattter. Witness went to the defendant's house and heard a conversation between him and his wife. Mrs. McConnell acknowledged in that conversation that she wrote the letter to Bud Elliott. Defendant accused her of being too intimate with Elliott, and appeared very much hurt about it, and very greatly excited. Mrs. McConnell further acknowledged her criminal intimacy with Elliott, and remarked to defendant that if they could not live together in peace they had better separate and not go to the court house about it Mrs. McConnell's confession was not extorted from her, but was made by her freely. At times after this incident, the defendant and his wife appeared to be reconciled to each other, but at other times the defendant appeared to be greatly excited and distressed. Finally they agreed to go to the house of the defendant's father and adjust their difficulty. Witness believed that the defendant was drinking some between the interception of the letter and the said November 15. He was in a reckless condition of mind, and very much in whisky when he started to his father's house on that day. Some one of the persons about the house asked witness to get a pistol and a flask of whisky away from the defendant. He promised witness that the pistol should not hurt him or his. The witness never dictated a letter to be sent to Bud Elliott. He heard that a second letter was to be written to him, and was requested, if it was written, to keep a copy of it. The second letter was to enter into a plan to entice Elliott to defendant's house, to enable defendant to kill him. Witness advised against the scheme and it was abandoned. Mrs. Wilson, who was to stay with defendant's children during his visit to his father's, tried to get the pistol from the defendant when he started. Defendant then was very vindictive towards his wife, and looked like a half drunk man. The witness remarked, before defendant started on that evening, that he was not in a fit condition to have a team, wife and child in charge. Witness did not recollect that he testified on a former trial of this cause that the defendant, on November 15, 1882, was a fitter subject for the lunatic asylum than the custody of a wife, child and buggy.

The defense at this point introduced in evidence the letter shown to the witness Mrs. McCloskey, and identified by the witness Hindman as the one acknowledged by Mrs. McConnell to have been written by her. That letter reads as follows:

"Thursday, November 9, 1882.

"*My dear B:*   I would have written long ago, but thought I would have seen you before this. I was not going to the show, and John was dreadfully disappointed, and said 'I wish B. was in town, I know he would take me.' Then E. said he was; and I went, expecting to see you, and looked until my eyes ached and could not see you. John and me were both dreadfully disappointed. This is the last letter I am going to write until I see you. Just to think, it has been nine long months since I saw you! You certainly don't love me as you used to, or you would come to see me. I could meet you some where if I knew when you were in town. I have one of L.'s pictures for you. Will give it to you when I see you. It is right good, but not as pretty as she is. I am nearly dead to hear from you. I have the blues so bad sometimes I can not help from crying. L. thinks I am writing to Santa Claus. I have seen the toys in town and told her of them, and she begs me every day to write for her, so I thought I would let you be her Santa Claus. I want to get her a doll and a little doll buggy. The doll will cost $1.50, and the buggy $1.75. I want you to get them for her. Let me know when you are in town, and I will meet you somewhere. I can go to Tom Stogdon's. He lives close to a wagon yard. I would like for you to come in town next week if you can. I have so much to tell you that I can't write. J. is nearly dead to see you, so next time you come to town come and see us. E. is never at home, only at meal time, and not half of the time at dinner. Excuse writing, as I have B. in my lap, and L. is talking me to death. Come and see me soon.

"Yours,                    A."

W. R. Vivrett testified, for the defense, that he was present on the former trial of this case, and heard the witness Hindman testify on that trial that when the defendant started to his father's on November 15, 1882, he was a much fitter subject for the lunatic asylum than for the custody of a wife, child and buggy.

Mr. Lyons testified, for the defense, that he heard Mrs. Wil-

son's testimony on the former trial of this case, he being a member of the jury. He did not hear Mrs. Wilson testify on that trial that Mrs. McConnell kept shaking her head during the conversation between her, Mrs. Wilson, and the defendant, on the evening of the return of defendant and Mrs. McConnell from Bear Creek. Mr. Briscoe testified substantially as did Mr. Lyons.

H. B. McConnell, the father of the defendant, testified, in his behalf, that the defendant and his wife and dead child reached witness's house about nine o'clock, on the night of November 15, 1882. The child was handed to the witness from the buggy. It was not then cold. The witness did not examine the wound on the child, but the defendant's wife told him that the wound was made with the hammer of the pistol; that the defendant struck at her with the pistol, missed her and struck the child accidentally. The witness did not then think of the child having been shot. The defendant was drunk, and witness was forced to order him out of the house. There was some thing on the child's head. Witness's eye sight was bad, and he saw the child only by candle light.

On his cross examination, the witness said that the child was dead when his house was reached. Its limbs were cold, but its body was still warm.

William Fain, who was next called by the defense, testified substantially as he did for the State, and, in addition, that he saw the defendant in town, early on the fifteenth day of November, 1882—the day on which he lost his child. Defendant did not know the witness, who was his brother in law. He appeared very unnatural. The witness had never seen him so before.

Doctor M. T. Emanuel testified, for the defense, that he had been the defendant's family physician and was often at his house. The defendant always appeared fond of his wife and children, and was uniformly kind to them. He nursed and cared for his wife throughout her last illness. Mrs. McConnell died of consumption several months before this trial.

Mrs. H. B. McConnell, the mother of the defendant, testified in his behalf that her husband handed her the dead child when he got into the house and she dressed its wound. Witness did not then think it was shot. Mrs. McConnell, defendant's wife, said it had been accidentally killed by striking it. Defendant asked witness that night if his poor little child was dead.

The motion for new trial raised the questions discussed in the opinion.

*Hood, Lanham & Stephens,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE.   Motions were made by defendant both to quash and in arrest of judgment for supposed fatal defects in the indictment.   There is no question but that the indictment is inartistic and in some unnecessary averments rather confusing.

With regard to pleading in a criminal case, it is well settled that if, eliminating surplusage, an indictment so avers the constituents of the offense as to apprise the defendant of the charge against him and enable him to plead the judgment in bar of another prosecution, it is good in substance under our code. (Coleman v. The State, 2 Texas Ct. App., 512; Burke v. The State, 5 Texas Ct. App., 74; Mayo v. The State, 7 Texas Ct. App., 342; Holden v. The State, 18 Texas Ct. App., 91; Moore v. The State, 20 Texas Ct. App., 275.)

Now, eliminating as far as we can all mere verbiage, confused matter and surplusage from the indictment in this case, it reads as follows (omitting formal portions):   That the accused, "late of said county, on, to wit, the fifteenth (15th) day of November, A. D. one thousand eight hundred and eighty-two, in said county of Parker, State of Texas. * * * and of his malice aforethought, contriving and intending one Viola Hunt McConnell to deprive of her life, did then and there with force and arms make an assault upon the body of the said Viola Hunt McConnell; and a certain pistol, the same being a deadly weapon, which he, the said Eli McConnell, in his hands then and there had and held, which said pistol as aforesaid was charged with gunpowder and leaden bullets, he, the said Eli McConnell, did then and there discharge and shoot off to, at and against her, the said Viola Hunt McConnell; * * * * * * and so the grand jurors aforesaid, upon their oaths aforesaid, do say that the said Eli McConnell, in manner and form aforesaid, feloniously, will-. fully and of his express malice aforethought, did kill and murder the said Viola Hunt McConnell, contrary to law and against the peace and dignity of the State."

In our opinion it is evident that the indictment, thus elimi-

nated, sufficiently, fully and explicitly charges murder of the first degree. (See Willson's Crim. Forms, Form 388, p. 173.) The motions to quash and in arrest were properly overruled.

Bills of exception 1 and 2 were taken to the action of the court in permitting the prosecution, over objections of defendant, "to prove by *four* witnesses the same harrowing facts attending the exhuming of the deceased child's body, and to permit the county attorney in his closing address to the jury to abuse the defendant for making his defense." As to the first bill: The evidence shows that the child was killed one evening; it was privately and hastily buried the next day. Some time afterwards it was disinterred with a view of ascertaining what, if any, wounds appeared upon the body. Two of the witnesses who were present on that occasion had testified to what they had seen, and the other two, one of whom was Doctor Legrand, the only medical witness who testified, were also permitted to give evidence as to the condition of the body and the nature and character of the wounds found upon it. We can perceive no error in this. It was clearly correct to have the testimony before the jury of the only physician who could testify as a medical expert, if necessary.

In his closing address the county attorney said: "The defendant in this case has stooped so low as to drag before you on the trial of this cause the infidelity of his dead wife, and publish her before the court house as a prostitute." We can not deny that this remark was "unfair." A defendant has a right unquestionably to introduce all such matters of defense as are admissible and calculated to mitigate, excuse or justify his actions, and whilst the prosecuting officer has the right to comment upon the nature and character of such defenses, still in doing so it is most improper to denounce and vilify him on account of his defenses, which often times accused parties are compelled from stress of circumstances unwillingly to interpose, or forced to avail of as drowning men will catch at straws. Counsel representing the State have been admonished time and again of the injustice and wrong of such practices and the danger they incur in such course of imperilling convictions which would otherwise be irreversible. (See Posey's Crim. Dig., "Privilege of Counsel.") To make vituperation and abuse, however, grounds for reversing a judgment, it must appear that the remarks indulged in were grossly unwarranted and improper; that they were of a material character and calculated injuriously to affect the defendant's

rights. (Pierson v. The State, 18 Texas Ct. App., 524.) Whilst the remark here complained of was reprehensible and unjustifiable, we do not think it should be held so grossly so as to constitute, *per se*, sufficient cause for reversal of the judgment.

No evidence having been adduced tending to establish insanity it was not error for the court to decline or fail to instruct the jury on that branch of the law. That defendant's mind was greatly excited by a knowledge in the first instance of his wife's infidelity, and that such natural excitement was inflamed, if possible, by the free use of intoxicants, is, perhaps, abundantly shown; but there is not the slightest evidence of legal insanity, or that degree of mental aberration showing a want of knowledge of right or wrong, and sufficient to drive him with uncontrollable impulse to homicidal deeds. His conduct towards his wife may readily be accounted for as the result of anger, rage and resentment, those natural emotions common to all men of ordinary temper, which in no manner are indicative of a state of mind irresponsible for its actions. (Leache v. The State, ante, 279.)

The jury were fully and properly instructed as to the law of drunkenness and its effect upon crime. They were further fully instructed in the law relating to homicide of one party when the intention was to kill another, and of homicide in the performance of an *unlawful* act. (Ferrell v. The State, 43 Texas, 503; McConnell v. The State, 13 Texas Ct. App., 390; Clark v. The State, 19 Texas Ct. App., 495; Musick v. The State, 21 Texas Ct. App., 69.) The law of murder of the second degree, manslaughter and *negligent homicide of the second degree,* were directly applied, and ably, to the facts in the case.

But, though appellant has been convicted of manslaughter, great stress is laid upon a supposed radical defect of omission in the charge with reference to that branch of the case, and the persistency with which the objection is urged induces us to discuss it. As stated in the able brief of counsel, it is that the charge entirely fails to submit or willfully ignores "the theory of an *accidental* (?) killing under such passion as would make the crime manslaughter. The word "accidental" is probably inadvertantly used instead of "*unintentional.*" It is an established rule that "if the act done is the unintentional homicide of a different person from the one intended, but without malice and while the mind is under the immediate influence of sudden passion arising from an adequate cause, such as anger, rage,

sudden resentment, etc., rendering the mind incapable of cool reflection, the crime is manslaughter, because the one intended would be manslaughter." (Clark v. The State, 19 Texas Ct. App., 495.)

We do not think the rule is applicable or properly invoked in this case. Defendant's anger or rage at his wife could scarcely be termed "sudden," since at least it is shown to have been in an active, uninterrupted state of existence from the time they left Weatherford for Staggs's, a distance of over eight miles, if, in fact, it does not show the existence of such condition for several days prior to that time. Suppose, however, that this passion had subsided and become cool, and that it was again suddenly aroused when, having gotten out of the buggy to pick up his wife's hat, defendant finds she is whipping up the horses, is rapidly driving off, leaving him, and, unable to control his passion, he fires at her and kills the child. We take it that this is the only possible view of the evidence to which the rule invoked is applicable. Do the facts support that view? On the contrary, defendant himself told Staggs that he did not shoot at his wife at that time, but "at the horses, and tried to cut one of them down." If such was his purpose, and the child was killed in pursuit of such purpose, the crime was negligent homicide of the second pegree. (Penal Code, Arts. 588, 589, 591, 592.)

But, no matter what his purpose may then have been, his shooting at that time did not kill the child. After this shooting the parties were at Staggs's house, and the child was then well and drank milk, as Mrs. Staggs testifies. No portion of the evidence, besides the declarations of defendant and his wife, definitely fix either the time, place, manner or circumstances under which the child was shot. That it was killed from being shot is made plainly to appear. Our reading of the facts furnishes us with no evidence requiring the instruction claimed as radical error of omission as to the law of manslaughter. If, however, such omission had been error, how does it appear appellant was injured thereby when his conviction was for manslaughter?

But the court did fail to charge upon the law of negligent homicide of the first degree. "If any person in the performance of a lawful act shall, by negligence or carelessness, cause the death of another, he is guilty of negligent homicide of the first degree." (Penal Code, Art. 579.) To constitute this crime the act in which the party committing it is engaged must be lawful, yet it must be one coupled with an apparent danger of

causing death, and at the same time there must be no apparent intention to kill, and the homicide must be the consequence of the act done. (Penal Code, Arts. 580, 581, 584, 585.)

Now, both defendant and his wife, when they arrived at his father's house, stated that the child was killed by the upsetting of the buggy. Whether true or untrue, that was the evidence as to their statement. It was part of the evidence in the case; it was defendant's theory of the death. Now what ever may be thought of this theory in view of the fact that the body had a bullet hole through its brains, it was one phase of the defense and appellant had the right to have the jury plainly, affirmatively and pertinently instructed upon the law applicable to it as part of the case. It was not for the caurt to ignore it; it was matter for the jury to pass upon, and the court should have charged upon it. Having failed to do so, and defendant having promptly reserved an exception to the charge for the specific error in omitting to give it, the error becomes fatal. It is expressly provided by statute that the charge of the court shall distinctly set forth the law of the case. If it fails to do so, and an exception is reserved to it and shown by a proper bill on appeal to this court, then it becomes the duty of this court to reverse the case for error, without inquiry as to the effect such error may have had upon the result. (Niland v. The State, 19 Texas Ct. App., 166; Bravo v. The State, 20 Texas Ct. App., 188; Clanton v. The State, Id., 616; Paulin v. The State, 21 Texas Ct. App., 436; Smith v. The State, ante, 316.)

Because the court erred in not submitting the law of negligent homicide of the first degree the judgment is reversed and the cause remanded.

*Reversed and remanded.*